No. 14.—EDWARD V. MONROE, plaintiff in error, vs. THE STATE OF GEORGIA, defendant in error.

[1.] When an act is done, to which it is necessary to ascribe a motive, it is always considered that what is said at the time, from which the motive may be collected, is a part of the res gestæ.

In general, what a party says, is not evidence in his favor, unless it be a part of a conversation, of which some other part has already been given in testimony. But where the declarations of the party accompany the act, and are a part of the transaction, it becomes admissible.

[2.] The declarations of a defendant, antecedent to the fact, are sometimes ad-

mitted as tending to explain and reconcile his conduct, and to discern the *quo animo* with which the act was committed.

[3.] Threats, accompanied with occasional acts of personal violence, are admissible to justify the reasonableness of the defendant's fears, provided a knowledge of the threats is brought home to him. And repeated quarrels may be shown between the parties, to establish the *malo animo;* but you cannot go back to a remote period, and prove a particular quarrel or cause of grudge, unless it be followed up with proof of a continued difference flowing from that source.

[4.] The slayer can derive no advantage from the character of the deceased for violence, provided the killing took place under circumstances that showed he did not believe himself in danger ; yet in case of doubt, whether the homicide was perpetrated in malice, or from a principle of self-preservation, it is right to admit any testimony of this kind as it tends to illustrate to the jury the motive, by which the defendant was influenced. If an assailant intends to commit a trespass only, to kill him is *manslaughter;* but if he design to perpetrate a felony, the killing is self-defence. In all cases, therefore, of this kind, the character of the deceased for violence, &c., has much to do in deciding upon the reasonableness or the unreasonableness of the defendant's fears. As a general rule, it is expedient and proper to receive proof of law-suits existing between the parties, and all the evidence which goes to show the state of feeling existing between them at the time that the act was committed.

[5.] It is error in the Court, in its charge to the jury, to intimate doubts as to the competency of legal testimony, which has been offered before them, it being calculated to weaken its force in their estimation. It is error also in the presiding Judge, to remind the jury of the existence of the Supreme Court, to which the defendant could carry his case up, if evidence offered in his behalf had been improperly rejected, and an appeal in consequence thereof, should become necessary; such remark, however well intentioned, being calculated to lessen their sense of their own responsibility, and at the same time to convey the idea that the proof already before them, was not sufficient to acquit the defendant.

[6.] Motions for new trials on new matter brought before the Court, should be received with great caution.

[7.] Whenever the objection to the juror would be good cause of challenge for favor, if discovered in time, it will be ground for a new trial, if not found out till after verdict.

[8.] A juror will be heard in his own vindication, and to sustain his impartiality.

[9.] No principle or rule of practice, tending to insure the impartial administration of public justice, and the purity of jurors, should, in the slightest degree, be abandoned or impaired.

[10 ] Where there has been an improper separation of the jury during the trial, the prisoner, if found guilty, is entitled to the benefit of the presumption that the irregularity has been hurtful to him; and the *onus* is upon the State to show, beyond a reasonable doubt, that the defendant has sustained no injury on account of the separation.

Indictment for murder, in Lee Superior Court. Tried before Judge WARREN, May Term, 1848.

The whole evidence, as embodied in the bill of exceptions, is incorporated in the opinion of the Court.

WARREN, COLQUITT and WELLBORN, BARTOW and WILLIAMS, S. T. BAILEY, DUDLEY and CRAWFORD, LYON and CLARK, HAW-KINS, STROZIER, SULLIVAN and MOORE, for plaintiff in error.

SOL. GENL. PERKINS, for defendant.

Argument in brief of FRANCIS S. BARTOW, of counsel for plaintiff in error.

The bill of exceptions in this case, may be comprised under four heads :

1st. The exclusion of the evidence offered by the prisoner upon his trial.

2d. The misdirection of the Judge in his charge to the jury.

3d. The separation of the jury, after they had been charged with the cause, and their misconduct while deliberating upon the verdict.

4th. The incompetency of one of the jurors impannelled, he having, before he was called to try the prisoner, manifested the strongest bias, and expressed a determination to convict him.

There are various specifications of error in the bill of exceptions, but they will all arrange themselves under one of the four heads above declared.　　We will examine them in their order. The prisoner was charged with murder.　　It was not denied that he had taken the life of James Macon.　　The presumption of law was of the sternest nature.　　It was incumbent on the prisoner to show his innocence.　　It was for him to prove whatever might mitigate, excuse or defend his act ; it was for the jury to consider, carefully and anxiously, whatever he could offer in his behalf. Upon reason, then, he should have been allowed a full hearing of every circumstance which could have influenced his conduct.　Justice would weigh with unwavering hand each atom thrown into her scales.　　The Common Law and the Statute Law alike affirm this doctrine.　　The Court below ruled, in effect, that it would hear no evidence, except that which could exhibit the conduct of the parties at the time of the killing.　　The Court, in thus ruling,

applied to this case the 15th section of the 4th division of the Penal Code: "That if a person kill another in his defence, it must appear that the danger was so great and urgent, at the *time of the killing*, that in order to save his own life, the killing was absolutely necessary; and it must appear also, that the person killed, was the assailant, and that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given."

The Court erred in the application of this principle. Even under that section, there is room for the prisoner's evidence. But there is another principle of the law of homicide which is distinct, and must not be confounded with the one just quoted.

The Penal Code of Georgia *has made no change* in the Common Law of homicide, except by abolishing the *shade of guilt*, which the Common Law has fixed on "excusable homicide." In this it has only declared, that "excusable homicide" at Common Law, shall be "justifiable" by the Statute. But the Penal Code expressly affirms in words, the distinction which has always existed between those two species of homicide, as applied to the *law of self-defence.*

There are two species of justifiable homicide, and Sir Michael Foster draws the distinction with great clearness. *See Foster's Crown Law*, 273. Our code has borrowed its language from his treatise. "Justifiable homicide," says section 12, "is the killing, &c. 1st, in self-defence, or 2d, in defence of *habitation, property* or *person*, against one who manifestly *intends* or *endeavors*, by *violence* or *surprise*, to commit a *felony* on either." And the next section declares, that "a bare fear of these offences shall not be sufficient to justify the killing. It must appear that the *circumstances* were sufficient to excite the *fears of a reasonable man*, and that the party killing really acted under the influence of those fears, and not in the spirit of revenge." This is what Mr. Foster calls justifiable self-defence. The 15th section, which is quoted above, has manifestly no reference to that class of homicide. It refers to self-defence in a case of mutual combat, or what at Common Law was termed excusable homicide, or as Mr. Foster calls it, "excusable self-defence." And to that species of homicide he applies the language of the 15th section. There was capital error in confounding these two and distinct rules of law. There was error in applying before hearing the evidence

offered, the law of the 15th section, when the prisoner demanded a different and a larger justification, under the law of the 12th and 13th sections of the code.    He claimed the principle of the Statute and the Common Law, which authorized him " to repel force with force;" " to pursue his adversary," not to *retreat* from him ; to kill the enemy who intended and endeavored to commit a felony upon him ; to act upon the *excitement* of his *reasonable fears*, and not to wait for the accomplishment of a wicked attempt. This was a right derived from nature ; a right above and beyond human laws.    *Grotius, Book* 1, *c.* 2, 53.    *Book* 2, *c.* 1, 189. This is the principle affirmed by Lord Holt in Mawgridge's case. "He that has shown that he has malice against another, is not fit to be trusted with a dangerous weapon in his hand."    *See also Guiscard's case, Foster,* 274.

He claimed that he had a right to show by evidence, that there was no *malice* in his conduct.    That he had acted from necessity in the maintenance of his personal and natural rights, or that at least, the circumstances attending the transaction, had reasonably excited his fears.    He had assumed the responsibility of deciding those questions for himself.    The propriety of that decision was now the matter for the jury to try.    Whether they would or would not affirm his act, was the fearful issue.    To do him justice, they must stand just where he did; they must feel as he felt ; they must know all that he knew ; they must see all that he had seen ; they must hear all that he had heard.    That he had a right to make such a defence is unquestionable.    *In Selfridge's case,* 160, Judge Parker lays down this rule, "Where from the nature of the attack there is reasonable ground to believe that there is a design to destroy life or to commit a felony upon his person, the killing the assailant will be excusable homicide, although it should afterwards appear that no felony was intended."

To the same point is Levet's case, 1 *Hale,* 42.

In *Rex vs. Scully,* 1 *Car. & P.* 319, the Court say, " The life of the prisoner was threatened, *and if he considered* his life in danger, he was justified in shooting the deceased."

The case of the *People vs. Anderson,* 2 *Wheeler, C. C.* 407, is to the same point.

There were then two subjects of inquiry :

1st. The acts and intent of the deceased.

2d. The acts and intent of the accused.

The evidence excluded on the trial, was offered to illustrate both these material subjects. Was that evidence proper and relevant? The object of judicial investigation, is the ascertainment of truth. Evidence is the means by which that is effected, and its rules are the same in civil and criminal cases. It is variously adjusted to perform its task in the most certain and direct way. Some things are self-evident, some are proved by the senses. But there are other subjects which address themselves to no palpable standard of truth, but to human experience of human motive, feeling and passion, and of the sources of hope and fear.

We look at all the influences which have surrounded our fellow, and then we sound his heart by the plummet we have applied to our own. We "judge not according to appearances." We trace the cause from the effect, and consider whether there is any necessary connexion between the act and the alleged motive of it. And when we have heard all, and gone through with the anatomy of the heart, we who feel the influence of all motives which prompt to action, and all passions that stir the breast, know how to judge our fellow. Hence, the inestimable value of trial by jury. But what a mockery it becomes, when the issue of life or death is tried, without evidence and without deliberation. The evidence offered and excluded, would have proved that the deceased and Monroe were in a state of war; war, waged by a criminal against him who would bring him to justice; conducted with malice and perseverance in a secret as well as open way; war, declared to the death against an unoffending man, who, so far from retaliating, made every effort to escape his adversary, until at last, threatened, goaded, pursued, hunted, until endurance was exhausted, he turned upon his adversary in the moment of hot pursuit, and did that which nature prompted him to do, and used that sword which the law herself placed in his hands and commanded him to use. This evidence, then, was indispensible to to show the acts and intent of the deceased. Other evidence was offered, to show the acts and intent of Monroe. His apprehension, his alarm, his knowledge of the intention of his adversary to take his life; that he had heard the threats, had escaped from the attempts to injure him, that he had been warned of his violent and vindictive nature, and had lived for weeks in a constant state of watchfulness, anxiety and alarm. In short, the evidence

offered, sought to delineate the whole story, from its inception to its termination; to paint each shade and bring to light every object in the scene; to present it all for examination and for judgment. Surely this evidence was pertinent; nay, that it went to the very marrow of the case. Yet it was rejected. No principle of law, and no decisions of Courts, can be invoked in aid of this exclusion. We refer to the following authorities in support of our position. *Reynolds vs. State*, 1 *Kelly*, 236. *State vs. Bellers*, 2 *Halsted*, 220, 230, 237. In that case, the Chief Justice says, " The question is, what excited the prisoner to the commission of the act? Every thing which operated upon his mind ought to be proved." 3 *Stewart and Porter*, 308, 315. I quote from that case one sentence. " If the circumstances of the killing were such as to leave any doubt whether he had not been more actuated by the principle of self-preservation than that of malice, it would be proper to admit any testimony calculated to illustrate to the jury the motives by which he had been actuated." *The State vs. Wright*, 9 *Yerger*, 342.

For the general principles governing this kind of evidence, see 1 *Starkie Ev.* 56, *et seq.* And as to the acts and declarations of the prisoner prior to the killing, see 1 *Starkie Ev.* 61, 66.

As to the effect of this testimony. That, we are not obliged to show, though it is an easy task. The jury are the best, as they are the legal judges of testimony.

Where there has been an improper rejection of testimony for the defence, or admission of testimony for the prosecution, a new trial will be ordered, though the Court be satisfied that the verdict was correct. *State vs. Peck*, 2 *Humph.* 78. *Wharton's Am. Crim. Law*, 639.

The second ground of exception, is the misdirection of the Judge in his charge to the jury. See bill of exceptions.

The charge was unfortunate, in three respects. 1st. It was calculated to mislead the jury, by withdrawing their minds from a fixed contemplation of the circumstances of the case previous to the act of killing, the Judge having expressed his doubts of the competency of any such testimony.

2d. The second branch of the charge complained of, was an improper judicial intimation that the defence was not made out, in consequence of the rejection of the testimony of the defendant.

But it was also improper, because it was calculated greatly to

diminish the responsibility of the jury in the verdict they were about to render, by referring to the Supreme Court as a correcter of errors. Neither the Court nor jury had any concern with the Supreme Court. The Supreme Court is made for the relief of parties in Courts, not for the relief of Courts or juries. I do not say this was intended, but such was likely to be the effect of such a reference. Courts are now as solemnly bound to administer justice under a feeling of deep responsibility, as they were before the Supreme Court was organized.

The 3d ground of exception is the separation of the jury after they had been charged with the case, and their misconduct while deliberating on their verdict.

First, as to the separation. The affidavits of the bailiffs are uncontradicted. The question raised by them seems to have been decided by a demurrer to their sufficiency in law. The facts stated by them are therefore conceded. See bill of exceptions.

By the Law of England, which is the Law of Georgia, "a jury, after the evidence given upon the issue, ought to be kept together in some convenient place, without meat or drink, fire or candle, which some books call imprisonment; and without speech with any unless it be the bailiff, and with him only, if they are agreed." Co. Litt. 227.

Whatever may have been the relaxation of this rule in civil cases, in capital cases, under no circumstances, will a separation be permitted, until a verdict is agreed on. And it has been held that a jury once charged, can never be discharged, except by the act of God. See Bac. Ab. Juries, G. Wharton Crim. Law, 644.

See this doctrine examined by the Supreme Court, in the case of The State vs. Reynolds, 3 Kelly, 56.

There are two classes of cases in England and the United States, upon the separation of juries in a capital case, either of which includes the case at bar.

The first class affirms the doctrine, that an unauthorized separation of the jury, per se, avoids the verdict, whether there has been misconduct or not.

The second class of cases affirms that the separation, if accompanied with the slightest suspicion of abuse, avoids the verdict; and to prevent this result, it must be made plainly to appear that there has been no abuse nor misconduct, and no possibility of

abuse.    There are no other cases to be found, and no other principle has ever been established.

In the case of *The Commonwealth vs. McCaul, Virginia Cases,* 302, this question was distinctly presented and argued, with great ability.   The Court say, " that the jury shall continue impartial and unbiassed, that to ensure this they should not be allowed by the Court to separate, are points acknowledged by all."    Also, " that where one juror has separated, proof of actual tampering is not necessary," &c.    *Ibid,* 304.    Moreover, "the Court will preserve with fear and jealousy, and will not expose the trial by jury in criminal cases, to the risk of contamination."   *Ibid,* 305.    " If the Court had, without necessity, permitted a juryman to go home without an officer, (which it would never do,) it would vitiate the verdict."    *Ibid.*    This decision has been adhered to in Virginia, and in a recent case affirmed in its whole extent.    *Overbee vs. Commonwealth,* 1 *Robinson,* 756.

In Tennessee, the same strict rule obtains.   In the case of *The State vs. McLain,* it is declared, "when there has been an unauthorized separation of a jury, for fifteen or twenty minutes, it is not necessary for the prisoner to prove that they were tampered with ; it is sufficient if they might have been."    *Wharton Crim. Law,* 645.    10 *Yerg.* 241.

In the case of *The People vs. McKary,* Ch. J. Spencer cites a case in point, and says, a woman of color was tried for murder and found guilty.   The jury had separated, after agreeing on a verdict, and before they came into a Court, and on that ground, a new trial was granted, and she was tried again.    18 *John.* 218.

In the case of *The People vs. Douglass,* the Court say, (Sutherland, J.) " I have no hesitation in saying, that where the separation of the jury is contrary to their duty towards the Court, and there is the slightest suspicion of abuse, their verdict should be set aside."    4 *Cowen,* 26.    See also, *Ibid,* 37, 38.    Opinion of Ch. J. Savage.

In the case of *The People vs. Ransom,* Sutherland, J. says, " The conclusion from these cases appears to be this : that any mere informality, &c. or any irregularity or misconduct of the jury, will not be a sufficient ground for setting aside the verdict, where the Court are satisfied that the party complaining has not and *could not have sustained* any injury from it."    7 *Wend.* 423.

In the case of *The Seate vs. Prescot,* 7 *N. H. R.* 288, Parker,

J. affirms the above opinion of Sutherland, but applies another principle to it, viz : " Where there has been an improper separation of the jury, during the trial, if the verdict is against the prisoner, he is entitled to the benefit of a presumption that the irregularity has been prejudicial to him.   And it is incumbent on the government to show, and that beyond a reasonable doubt, that the prisoner had suffered no injury by the departure from the forms ordinarily pursued in Courts of justice."

These are the only limitations which have been put by any Court, upon this salutary rule.

And whether the Court take the old English rule, in all its strictness, as adopted in Virginia and Tennessee, or the more relaxed one of New York and New Hampshire, the present case is equally within it.

In Georgia, the Courts have universally upheld the trial by jury, in its purity. See 1 *Kelly*, 203.   *Ibid*, 615, in the case of *K. P. Boon, vs. The State.*   Also, the case of *State vs. Helvenston*, Berrien, Judge, *R. M. Charlton's R.* 28.

In the case of *The State vs. Sherbourne, Dudley's R.* 28, the same doctrine was upheld.   Also, in *McGowen's* case, the same question was decided in the sixth Circuit Court for the District of Georgia, by Judges Johnson and Cuyler, in which case the jury separated without the knowledge of the officers. and the verdict was set aside.

The rule which appears to embrace every case we have had under review, may be thus stated : " An unauthorized separation of the jury in a criminal case, vitiates the verdict, unless it manifestly appears, from the facts attending the separation, that there was not and could not have been the least injury resulting therefrom."   Our own Courts have maintained the sterner rule, but the one just suggested is sufficient for the exigencies of this case, and is opposed by the authority of no case that can be produced.

The facts of the case show a separation, one unauthorized and most suspicious ; it appearing that one of the jurors, who was in favor of conviction, took one who was in favor of acquittal, out of the jury-room, into the street or field, and after conversing together for fifteen or twenty minutes in the dark, they returned, and the juror, who had previously been in favor of an acquittal, declared himself willing to sign a verdict of guilty.   Now, what

passed between these conspiring jurors? There is ample scope for the indulgence of the darkest suspicions.

It is settled law, that if evidence, not given on the trial, be communicated by a juror to his fellows, it will vitiate the verdict. *Wharton Crim. Law*, 652. Either this evidence was clandestinely communicated, or something more befitting darkness was done.

4th exception. One of the jurors went upon the jury to try this cause, having already prejudged it; having both formed and expressed a decided opinion, and having announced his intention as a juror, to " stretch the prisoner." The affidavits in support of these facts, are uncontradicted. The prisoner swears, that he never knew or heard of them previous to his being sworn on the jury. " When it appears after trial that a juror had prejudged the case, but had omitted to avow such predetermination, or when put on *voir dire* had given false answers, and such formation of opinion was unknown to the party at the time, a new trial will be granted." *Wharton Crim. Law*, 654.

In the case of *Dent vs. Hundred*, 2 *Salkeld*, 645, a new trial was granted upon affidavit, that the foreman declared that the plaintiff should never have a verdict, whatever witnesses he produced.

The same point is decided in the case of *Ramadge vs. Ryan*, 9 *Bing.* 333. 23 *Com. Law*, 296.

In the United States, the decisions have been uniform to the same point.

In the case of the *State vs. Hopkins*, 1 *Bary*, 365, one of the jurors declared before the trial, that he was determined to hang the prisoner at all events. A new trial was granted.

The same point is decided in the case of the *People vs. Bodine*, 1 *Denis*, 281.

But perhaps the strongest case in point, in this country, is that of the *U. S. vs. Fries*, 3 *Dallas*, 515. The facts were, that Rhodes, one of the jurors, declared, " that he was not safe at home for these people, (meaning the insurgents,) and that they ought all to be hung, and particularly that Fries must be hung." The juror denied that these expressions were pointed at Fries. Judge IRDELL, granted a new trial.

This decision is quoted with great approbation by this Court. 1 *Kelly*, 624.

The right to an impartial jury, is guaranteed by the Constitution of the U. States, and of the State of Georgia.   1 *Kelly*, 229.

This doctrine has been carefully considered in this State, in the case of *Glover vs. Woolsey & Co. Dudley's Rep.* 85.   In this case, (a civil one,) the Court draw a distinction to this effect, that where the disqualification of a juror arises from causes external to himself, or in other words, from causes which do not affect his impartiality, the objection in civil cases comes too late, after verdict; but even then, if it were shewn that the juror acted under the influence of improper motives or principles, a new trial would be granted.   And moreover, that where there was good cause of challenge unknown to the party at the time, a new trial may be granted.   *Dudley*, 88.   It may be said, that the incompetency of this juror, might have been discovered by the *voir dire* questions. It might or it might not, that does not appear.   We answer to that objection : 1st. A prisoner is not compelled to use the *voir dire*.   It is a right given to him and to the State too, in aid of their challenges ;  it may or may not be exercised.   If the prisoner knows of no cause of challenge, why should he apply the test to the juror ?   Is it not obvious that he is yielding all the advantage which a good character may have created for him, in the favorable bias which every honest man may have formed in his behalf?   Besides, will not his very exercise of the *voir dire* indiscriminately, create a prejudice, and compel him to exhaust his peremptory challenges to his great injury.   See the observations on this subject in 4 *Blackstone*, 353.

But 2d. A prisoner charged with crime, is never held to waive any of his rights.   The giving of additional means for his protection, never withdraws any he had before.   All are cumulative, and if given at all, are given freely, " without money and without price."   See *Ch. J Spencer's opinion in the case of the People vs. McKary,* 18 *Johns.* 218.

In the case of the *State vs. Williams*, 3 *Kelly*, 460, the Court say, " that the prisoner is entitled to the whole of his rights to the last hair's breadth, and he shall have them, and that Courts as well as jurors, are bound to give to the accused even the benefit of their doubts."

3d. This question has been settled by repeated adjudications, as we have before seen, clearly drawing the line of distinction, between those causes of challenge which might have been taken

at the time, and which do not affect the impartiality of the juror, and those which were unknown, and involve the grossest partiality and the most inveterate bias. *United States vs. Fries, Dudley*, 85.

4th. An impartial jury is guaranteed by the Constitution and the laws; it is the absolute right of the prisoner, a right of which the supreme Legislature may not deprive him, and which this Court is bound to vindicate.

We ask a new trial in this case, because the prisoner has been denied his dearest constitutional rights.

1st. He has been denied the right of proving his innocence by witnesses.

2d. He has been denied the right of being judged by his peers, to whom alone belonged the questions of law and fact.

3d. He has been denied an impartial jury to try his cause.

4th. His life has been subjected to the keeping of men, whose conduct has shewn them to be unfit depositories of such a charge, and unworthy to minister in a Court of justice.

Brief of the argument of S. T. BAILEY, for plaintiff in error.

In discussing the questions raised by the Bill of Exceptions, in behalf of the unfortunate, and I must say much wronged plaintiff in error, I shall confine myself chiefly to two grounds of error: viz. rejection of evidence by the Court below, and his charge to the jury. In view of the case made by this record, may I not ask, may not every freeman with alarm inquire—do we live under a system of laws whose soul is despotism and not justice, or do we live where just laws are badly administered? Who but the strongest would trust the law, as expounded in this record? Have we no chart to go by? Have the canons of the fathers of the law become obsolete? or have the expounders of the law become wiser than the law itself? Every citizen, when he is arraigned for the criminal violation of the law, has a right to point the Court to, and require the Court to regard the following fundamental principles, standing at the head of the code by which he is to be tried, viz:

*Prince*, 620. " A crime, or misdemeanor, shall consist in a violation of a public law, in the commission of which there shall be an *union* or *joint* operation of *act and intention*, or crimi-

inal negligence." "Intention will be manifested by the *circumstances connected with the perpetration* of the offence; and the sound mind and discretion of the person accused."

*Prince*, 622. "Murder is the unlawful killing of a human being in the peace of the State, by a person of sound memory and discretion, with malice aforethought, either express or implied."

"Express malice is that *deliberate intention* unlawfully to take away the life of a fellow creature, which is manifested by *external circumstances capable of proof.*"

"Malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart." ;

*Prince*, 623. "A bare fear of any of those offences, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing; it must appear that the *circumstances* were sufficient to excite the fears of a reasonable man, and that the party killing really *acted under the influence of those fears*, and not in the spirit of revenge."

All these great safeguards were wholly overlooked, or disregarded in the trial of my unfortunate client, according to the rulings in that trial. "Joint operation of act and intention," were divorced. In that trial it was not permitted to "show the manifest intention, by the *circumstances* connected with the perpetration of the offence, and the discretion of the accused." In that trial it was not permitted to show, "by external circumstances capable of proof," that the "deliberate intention unlawfully to take away the life of a fellow being," was wanting, and that therefore there could be no malice. In that trial it was not permitted to show "any considerable provocation;" and that the killing was not the work of "an abandoned and malignant heart." In that trial it was not suffered the prisoner to show, "that the *circumstances were sufficient to excite the fears of a reasonable man, and that the party killing really acted under the influence of those fears, and not in a spirit of revenge.*"

The sole and only question before the Court below to try, was the intention to murder—the *malicious intention* to take life, and yet, strange to tell, the elucidation of that question was prohibited by the Court. The Court says to the victim, the killing is proven, and thereby malice is *prima facie* proven; the *onus* is on you to show, by proof, the absence of malice, and yet you shall not be

permitted to introduce such proof!   It is no answer—it is worse, it is mockery to reply, you may show all that took place at *the killing.*   It is not one time in ten, that enough transpires at the killing to manifest absence of malice ; and yet the act of killing throws the onus on the slayer.   No man may, with safety, defend himself, his family or estate, unless he has by him a witness to prove the first assault.   The outlawed desperado may prowl for the life of the innocent and honest ; he may lay his plans and his snares, for the life of his victim. in the face of day, and in the face of society, and yet if his intended victim is seen to kill the assassin within his very domicil, or if he confesses that he slew him in self-defence, nothing but the killing is legal proof; the assassin's bad character; his threats and murderous plans; and the good character of the prisoner go for nothing, and the Court cruelly proceeds to perpetrate what the hand of God had not permitted the assassin to accomplish !

Mr. Starkie, in his most learned and philosophical work on evidence remarks, " The law constantly notices the universal principle of evidence, that a man shall be taken to intend that which he does, or which is the immediate and natural consequence of his act.   In many cases, therefore, the allegation of intention, though essential to sustain the charge or claim, requires no other proof than that of the fact itself, the intention being the result or inference which the law draws from the act itself, in the absence of a legal *justification or excuse.*"   " In the absence of any principle or rule of law, by virtue of which either a conclusive inference, or any presumption as to intention ought to be drawn, from the act or its circumstances, the specific intention of the agent is a matter of fact on which the jury are to exercise their discretion, on the *evidence before them,* as in ordinary cases, civil as well as criminal.   Thus on a charge of homicide, it may be for the jury to say whether the act was done with a malicious intent to destroy another, or merely to alarm and terrify him, or resulted from mere unavoidable accident, independent of any intention to injure another, or even of carelessness or negligence ; and according to that determination, the offence may amount to murder or merely to manslaughter, or chance medley.   In order, however, to arrive at a just conclusion upon such questions, the jury ought to act upon those presumptions which are recognised by

the law, as far as they are applicable, and *their own judgment and experience, as applied to all the circumstances and evidence.*"

"When the particular intention is essential, evidence of former attempts with that intention, is admissible to prove the intent. It is a general rule, that whenever the fact of intention is to be established by collateral evidence, it may be rebutted by contrary evidence." 2 *Starkie Ev.* 417, 6*th Am. edition.*

In the *King vs. Woodfall,* 5 *Burr. R.* 2661, Lord Mansfield says, " That where an act in itself indifferent, if done with a particular intent becomes criminal, then the intent must be proved and found; but where the act is in itself unlawful, the proof of justification or excuse lies on the defendant, and on failure thereof the law implies a criminal intent."

In these short paragraphs from our code, from *Starkie and Burrows,* the rules of law that ought to have governed the Court below, are briefly but clearly laid down. By them he ought not to have mistaken his duty in the admission of evidence to try the only issue before him; viz. whether the malicious intent were present. How and by what better evidence than that repelled by the Court below, could such intent be disproved.

*Griffin Smith* was offered to prove that deceased, within six months, attacked prisoner with deadly weapons, and that he escaped by flight. It was also proposed to prove by *Smith, by Wyche, by Bedford, by Warren, by Monroe, and by Cook,* that at the fall term, 1847, of Lee Court, prisoner, by the direction of the Inferior Court, one of whom he was, had acted as prosecutor on a bill found by the Grand Jury, against the deceased, for embezzling the county funds, and that deceased then declared that prisoner should not live to be at the trial of that bill, that he would kill him, and that he continued such threats up to the time of the killing, together with violent acts and menacing conduct, such as lurking about the premises of prisoner, in a stealthy manner, armed; and that by such threatening conduct and violence, he compelled prisoner to abandon his practice in the day time, and to ride to visit his patients secretly in the night. By *Hawkins, Smith* and others, it was proposed to prove that these threats and threatening conduct of deceased were known to the prisoner, and that he, by his speech and conduct, manifested great alarm and apprehension of deceased. It was also proposed to prove by

*Smith* and others, that prisoner applied to a magistrate to bind deceased to keep the peace towards him, and that he was advised not to do it, as it would aggravate and make him worse. It was also proposed to prove that deceased was a violent, bloody-minded man, disposed to take secret advantage of an adversary; all of which was repelled by the Court, most manifestly against law, as we strongly believe. The clear and explicit direction of our Statute, requiring a union of act and intention to be proved to convict of crime, and then that malice shall be judged of by the jury from all the circumstances connected with the killing, and that reasonable fear shall repel the conclusion of malice, and excuse the act, would seem to leave "the wayfaring man, though a fool," no room to doubt the duty of the Court in such a case. But without such clear and explicit direction, with the rules of the Common Law before them as to the proof of malicious intent, no Court in England or America, of any repute, ever committed such errors as those committed by the Court below. I ask the indulgence of the Court, while I refer to some cases and authorities to prove this.

*Mr. Starkie* says: "The legal distinctions which range themselves under the head of provocation, seem to depend principally, if not entirely, upon the question whether, in the absence of previous malice, the act of the defendant, under all the circumstances of the case, can be attributed to the general *infirmity and weakness of our nature,* or on the contrary, the facts themselves evince a wicked and vindictive disposition and malignant spirit, fatally bent on mischief; for as *Sir Michael Foster* observes—"it is to human frailty, and that alone, that the law indulgeth in every case of felonious homicide." 2 *Starkie Ev.* 523.

It is laid down in *Bacon,* "If a man, though in no great danger of serious bodily harm, *through fear, alarm or cowardice,* kill another, under the impression that great bodily injury is about to be inflicted upon him, it is neither manslaughter nor murder, but self-defence." 7 *Bacon Ab.* 211. Same principle is said to have been decided in *Grainger vs. the State,* 5 *Yerger R.* 459.

"A man may kill in defence of his person, habitation, property, &c. one who manifestly intends to commit a felony upon either, and he need not retreat: *this must appear from the circumstances.*" 1 *Russel on Crimes,* 549. Previous conduct may be looked into to show grounds of suspicion. *Ibid.*

*Lord Tenterdon*, in his charge to the jury, in the *King vs. Lynch*, said, " You will also take into consideration the previous habits and connection of the deceased and the prisoner, with respect to each other. 24 *Com. L. R. Con.* 341.

In the *King vs. Sculby, Garrow, Bar.* said, " But here the life of the prisoner was threatened, and if *he considered his life in actual danger* he was justified in shooting the deceased as he had done, but if *not considering* his own life in danger, he rashly shot this man, who was only a trespasser, he would be guilty of manslaughter." 11 *Com. L. R. Con.* 406.

· In the *Queen vs. Smith*, 34 *Com. L. R. Con.* 335, the Court allowed evidence of previous threats and violent conduct of deceased.

So in the *Queen vs. Fisher, Ib.* 345, the previous aggravating conduct of the deceased towards the son of the prisoner, was gone into.

So much for the law and the practice in England, where the officers of the crown were never accused of improper indulgence towards a delinquent subject.

Let us now look for a moment to the practice in America.

In the *State vs. Patrick Blake*, Platt, Judge, says, " This, as an *isolated fact, remote in point of time* from the transaction forming the charge the prisoner is now called on to answer, is inadmissible. So a former quarrel *unconnected* with the transaction wherein the death ensued, cannot be given in evidence. But if you can *fill up the chasm* of time between that wherein the first and second wound was inflicted, showing that the latter flowed from the former *occasion*, or was *connected therewith*, or if you can show there were frequent quarrels between the prisoner and the deceased, taking place but a short time preceding her death, you are at liberty to produce such evidence." ·1 *City Hall Recorder,* 100.

In the case of *Christian Smith*, tried before Judge Van Ness, the witness Lake, testified that he had a conversation with the prisoner; that the prisoner complained that the deceased had trespassed upon him continually; he further stated that prisoner and deceased had been at variance a number of years, and that the dispute extended to their respective families. 2 *City Hall Rec.* 78. Jacobson, another witness, testified that violent quarrels subsisted between prisoner and deceased, and frequent

*lawsuits* were instituted; that the prisoner seemed disposed to live in peace, but the deceased refused to conciliate, or listen to terms of conciliation, declaring that he would give the prisoner law, or words to that effect. During life deceased was a bad man, and his wife a turbulent woman, with whom he could not live in peace. 2 *City Hall Rec.* 77, 81.

In the *State vs. Zellers,* when evidence of the provoking and harrassing conduct of the deceased long previous o the killing, was objected to, Chief Justice Kirkpatrick said, "No man can defend his property, other than his dwelling house, from a trespasser, by making use of a deadly weapon; but inasmuch as the distinction between murder and manslaughter depends upon the *impulse* of the mind with which the act was committed, *every circumstance which goes to show the feelings of the parties towards each other, may be proven.* That temper which at one time might not be excited, might, under the excitement of *other circumstances,* be more easily roused; and *therefore, it may be received by the jury to show the state of mind of the parties.*" 2 *Hals. R.* 230.

Again the Chief Justice remarks, "The question is, what excited the prisoner to the commission of the act? *Every thing that could operate upon his mind may be proved.* But you cannot give in evidence, conversations or acts of the deceased, which never came to the knowledge of *Zellers,* for they could have no influence upon his mind, and could neither justify nor extenuate the crime." *Ibid,* 237.

In the *State vs. Drew,* the Court went into evidence of the acts of the deceased some weeks prior to the killing. 4 *Mass. R.* 392.

If reported cases upon questions of this kind are not numerous, it is owing to the fact that the Courts and the Bar are generally too learned and too regardful of the lives, the feelings, and the reputation of their fellow-citizens, to commit such cruel errors as are manifest in this record.

As to the ground for new trial, of gross misconduct in some of the jury, in separating and leaving the jury room without an officer, I trust there are sufficient errors to reverse the decision of the Court below, without relying upon this; and yet the safety of society so essentially depends upon pure and uncontaminated verdicts, that I trust this Court will not feel itself at liberty to pass in silence the gross, the dangerous misconduct of this jury.

Monroe *vs.* The State of Georgia.

I might bring to the notice of the Court a multitude of adjudg-ed cases, deciding that the bare separation of the jury, after being charged with the case, is *per se* a good cause to set aside a verdict. Other cases may be shown that confine this rule to capital fel o nis. But I am free to confess that the better authorities do not go to this extent; and I hope and trust I am incapable of trying to mislead this Court. I believe the law is correctly decided in the *People vs. Douglass,* by the Supreme Court of New York, that separation of the jury in no case, *per se,* vitiates their verdict. But that the rule seems to be that the jury must have separated without leave of the Court, or without an officer, and that there is suspicion of unfair or improper conduct of the absent jurors.

In that case Justice Woodward remarks, "I have no hesitation in saying, that where the separation of a jury is contrary to their duty towards the Court, and there is the *slightest* suspicion of abuse, their verdict should be set aside." 4 *Cowen's R.* 37.

In the case at bar, the jury separated in violation of the order of the Court, and without an officer. The affidavit of Levining, the bailiff, proves that a captain Blake took out another juror, who was for acquitting the prisoner, into a cornfield back of the house where the jury were assembled, and there in the dark discoursed with him for about half an hour, until the juror, thus in favor of the prisoner when he went out, returned against him, and that during all this time other persons were around the house. Here was not only violation of the orders of the Court, but such conduct as ought to excite suspicion of foul and illegal tampering with the juror. He changed his mind, not in the jury room in presence of his fellow jurors, but while out with this bloodthirsty "*captain*" Blake, and perhaps other confederates. How was this effected? Is there not ample room for grave suspicion? Was it by persuasion, by threats or by bribery? It must have been by one or the other—it may be by all. And by whom was it effected? It may be by lurking strangers, or it might be by captain Blake. In either case it avoids the verdict. Can it be tolerated in any case, civil or criminal, and above all in a case involving the life of a good citizen, that a "militia captain," in contempt of all law, and contempt of the Court and its officers, may retire into a cornfield at midnight, and in effect, write a decree that such cit-

izen shall die, and then expect that any Court in Christendom will ratify his decree? No matter if none but Blake meddled or tampered with this juror; no matter if Blake used none but verbal persuasion—if he effected a change in this juror's mind, by threats or by arguments, it clearly vitiates the verdict. The law intends and requires that the verdict shall be the joint minds of twelve men, acting jointly and in the presence of each other, upon the evidence, and the law, and arguments, as delivered by the witnesses, the Court and counsel. But if it is permitted for one juror to take out another and argue the case with him, where the ten other jurors are not permitted to correct or deny his statement of the evidence or the law, there is no safety in jury trial. Why did Blake retire from the jury room to discourse with this refractory juror, if he was not about to say or do something improper? Will any honest man say such conduct does not authorize suspicion? Nay, does it not *force* suspicion upon the mind? Had the juror been a female, and Blake had been indicted for fornication, what jury would fail to convict him on presumption alone?

The prisoner moved the Court below for a new trial, on the further ground that Stanley, a juror, had expressed his opinion against him before the trial, and of which he was ignorant till after the trial.

*Bacon* says, " When it is proved that a juror stated before trial that his mind was made up against a party against whom a verdict was found, a new trial will be granted." 9 *Bacon Ab.* 597.

"When after the trial, it was ascertained that a juror had previously formed an opinion against the prisoner, in a criminal case, though he stated on oath he had not, a new trial was granted." *Id.* 598. "If there were good cause of challenge to one of the jurors, but this were not known and consequently could not be taken advantage of at the trial, the Court will grant a new trial." *Ibid.*

The only remaining exception that I shall consider, is that complaining of the charge of the Court below, reminding the jury that if he had erred on the trial of the prisoner, he could correct such error before this Court; thereby most distinctly intimating to the jury, that they must find the prisoner guilty. For without such verdict it would be impossible to get the cause before this Court in behalf of the prisoner! What had the jury to do

with, or to consider of the errors of the Court, or the rights of the prisoner to come up to this Court? Were any of these considerations within their oath or legal duty? In so solemn a duty as they had to perform, is it permitted to call off their attention from the law and the evidence, or to direct their attention to considerations that may seem to lessen their awful responsibility? I beg this Court, for the safety of our citizens—for the safety of jury trial, to put the seal of its condemnation, now and forever, upon such conduct.

And although the Court below seemed to look upon it as a trifling matter, to be branded a *murderer*, so long as this prisoner can escape the gallows—yet the unfortunate plaintiff in error feels, that after all this tribunal can do for him, one half of "the body of this death" must go with him to the grave, never to be hid from him or his family, until the Judge shall say to him and them, that a life of virtue and innocence ought to have protected him, on earth, from such calamity.

*By the Court.*—LUMPKIN, J. delivering the opinion.

This cause came on for trial, May, 1848, before his Honor LOTT WARREN, and the prisoner being arraigned and pleaded not guilty, a jury was regularly empannelled according to law to try said cause. The indictment was read to the jury, from which it appeared that the defendant stood charged with killing one James A. H. Macon, in said county, on the twelfth day of May 1848. The following testimony was introduced on the part of the State, to wit:

*John S. Johnson* sworn, testified and said, he witnessed the shooting on Friday the 12th, at Tilman's store, in this county. Dr. Monroe came in that evening after dinner—he and Tilman together—Monroe with a doubled barrelled gun, took his stand and stood near the counter in Tilman's store. In a short time prisoner cocked his gun and looked out of end door up the road. Witness looked out and saw deceased coming—in a few minutes afterwards prisoner cocked second barrel, and observed the springs were very strong. As deceased advanced nearer, prisoner walked near the end door and peeped out; prisoner then turned and walked to front door and peeped out—prisoner then retreated and walked out again—means by retreating, that he

stepped back into the house. Thinks prisoner walked out before going back. Prisoner halted near a row of boxes to the left, between prisoner and deceased. Prisoner then prepared to shoot, and stepped out levelled his gun, and observed to some one, "if he wanted to shoot, to shoot," but reserved his fire some four or five seconds and possibly longer. He, prisoner, did fire. Witness in a minute stepped out and found James H. Macon nearly dead. Mr. Tilman and prisoner came to the store about one o'clock—prisoner was in store fifteen or twenty minutes before he went to door to look out. The position prisoner took in store enabled him to see deceased's house. When witness first saw deceased, he, deceased, was one hundred and fifty yards from store. Deceased was coming from direction of his residence. Prisoner then stepped to front door and cocked second barrel. The position of row of boxes was such as to conceal prisoner from the observation of any one coming from residence of deceased. The boxes were of such height and size, as to have concealed any one coming the way deceased was, from observation, the last time witness saw him. Deceased had to come to the store before the concealment could have been removed. The second time prisoner went out, witness could not say positively, whether he, prisoner, took a position that would have concealed him from observation of deceased. Both barrels of prisoner's gun were cocked when he went out second time. Prisoner's gun was level at the time he remarked, "if you want to shoot, shoot." The remark and levelling of the gun were at the same time. After firing, prisoner walked off in a short time. Prisoner's shop is forty or fifty steps from Tilman's store, and opposite side of street. Prisoner's residence was at his mother's. Deceased had not been removed from the place where he fell, when witness first saw him, and thinks it likely he was coming into store when shot. Witness heard no reply when prisoner said, "if you want to shoot, shoot." The last time witness saw deceased, deceased was forty or fifty feet from store, and coming as if he intended to come into store. Deceased was not in direct route to Post Office when he fell. Deceased frequently came by store when going to Post Office. The other route to Post Office was by Philip Monroe's residence—the latter was nearest route. Most usually deceased went this route, but frequently the other way, and frequently came into the store going and coming, and especially when he had business.

*Cross Examined.*—Deceased was thirty or forty steps nearer the store when he fell, than he would have been had he been on a direct route. Deceased had a gun when he fell, (yauger gun.) Witness has seen gun—fine gun—thinks it would kill a man two hundred yards, but it would have been good shooting. When witness first saw gun after deceased fell, the gun was cocked—there was no game there for deceased to shoot. Deceased was on hostile terms with prisoner. Deceased had a couple of pistols when he fell. Prisoner was in his office in the morning and deceased was in town with his gun—walked all over town—appeared out of humor, or something to be the matter with him. Witness saw deceased at this time walk down by prisoner's office with his gun, and back again. Deceased appeared to be reckless. Witness could not say whether deceased was bent on mischief or not. Witness heard during the morning, deceased ask George Monroe what he had brought up that gun for? George stated that he brought it up for prisoner, that he understood deceased had his gun for him, prisoner, and that he, prisoner, wanted, his gun to defend himself. Deceased observed that he, deceased was not after prisoner—that he did not bring his gun up for that purpose, but if he, prisoner, wanted to play at that game, he, deceased was with him, prisoner. That he, George, could say to his brother, if he would take his gun back, or send it back, he would not interrupt him; but if he came out with that gun, he, deceased, would take him between the eyes. Deceased was excited and appeared to be reckless. The position of deceased's house was such, that if deceased had been standing in piazza, he, deceased, could have seen prisoner standing in Tilman's store. Deceased could not have seen down the counter in the house, and could not have seen unless he had been at end store door or at piazza. Deceased could have seen prisoner at either door of the house, from his, deceased's house. In the morning prisoner had been in his office three or four hours. Witness saw deceased pointing his gun in the morning at a cow. Did not see him point towards office from behind a China tree. Prisoner spent a good deal of his idle time at Tilman's store. The cow was down the street, not in direction of prisoner's office. Heard deceased say nothing about killing beef. Tilman's store was not the usual place of resort for deceased. Deceased called in frequently on

business.  Knows of no business deceased had there in the morning or evening.  Deceased called in not very often unless he had business.  Deceased was shot in left shoulder and breast—supposed his, deceased's, left hand must have been raising up.  Supposes from where deceased was shot, must have turned towards Tilman's store, where prisoner was.  If deceased had been turned towards Post Office, he would have been shot in right shoulder.  When prisoner shot he stepped out two feet from boxes, and was in fine view of deceased, when he shot.  Deceased had his gun on his shoulder when witness last saw him, with his hand on each end.  Thinks there was time for deceased to have cocked his gun and spring triggers, but does not know.  Witness expected to hear the report of two guns.  Witness was often interrupted when conversation with George was had—did not hear the whole conversation, but has detailed what he did hear.  One of the pistols in deceased's possession was a duelling pistol—the other a common one.  Deceased carried them in his bosom—can't tell whether they were concealed or not.  Saw him frequently carrying them.  Witness walked off when prisoner shot, but saw all that could have been seen in the house where he was.  Ten o'clock when witness saw George with his gun.  Saw prisoner at his office about 8 or 9 o'clock, and saw him no more until he came to the store with his gun.  Corrects this expression, and saw prisoner at his office twice, some or one two hours before he came to the store.  Prisoner has to go the street by the store to his office when coming from home.  Witness means by prisoner's peeping, that he put his eye out, his body was not out, and that he put his head where he could see without being seen.  Knows nothing of a man's passing by at the time of peeping with a plank on his shoulder.  Prisoner is a peaceable citizen.  Deceased was a man of violent feelings, rash man—apt to have difficulties and fusses—supposes that prisoner knew deceased was a man of this character.  Never knew of deceased shooting any body.

*By State, resumed.*—Deceased was a brave man—deceased was never known by witness to take advantage of a foe in combat.  When witness saw deceased with his arms over his gun, he was walking with his head down.  The gun was over the back of the neck of the deceased, with both arms hanging over it.  This was the position when prisoner looked out of the door.  There

was a wound high up on the arm, going through the arm. Deceased could have received this wound with his arms above the gun, but he would have to have turned. The wounds in the arm and breast went direct and plumb. Deceased frequently brought a gun down town, but not his yauger, occasionally he carried his yauger. Witness had a little son at his residence near the store, 9 or 10 o'clock in the morning. George Monroe brought the gun down town, carried it to the prisoner's office. Conversation with George was immediately after gun was placed in office. Tilman and prisoner came into store together. Tilman soon after went off. Prisoner was in the habit frequently of coming up at this hour of the day, and stopping at the store, but was not in the habit of bringing gun with him. Deceased appeared to be disturbed all morning, but did not seem enraged till after prisoner's gun was brought. Deceased went to his dinner later than usual —about a quarter or half hour later than usual. Does not know whether prisoner went to dinner at all or not. Came in with Tilman about the time Tilman came from dinner. Deceased was a feeble man—never looked like he was well; witness would not suppose he was a sound man. Mr. Applewhite was in the house with witness at the time of the difficulty, and no one else that the witness recollects.

*Cross-examination resumed.*—Deceased walked down street by prisoner's office before gun was brought down. Deceased had a shot gun, deceased usually hunted rabbits &c. with shot gun. Saw deceased going to Post Office frequently on day. Prisoner's gun was a shot gun, and could not have killed so far, witness thinks, as the yauger of deceased. Never saw deceased in the Court House on the day peeping out of the window.

*Dr. Elijah H. Warren*, sworn, deposed as follows: Witness saw deceased on day he was killed. Witness is a practising physician, and examined superficially, the wound on deceased. 'Twas a shot gun wound. Thinks wound killed him. There were four wounds in breast, to left of nipple, or a little below—three in shoulder and one in his arm, one shot was at the connection of arm and shoulder, and came out through the thin flesh part where it entered. This shot was at the lower part of said connexion. One broke bone of arm—one of them was at the joint of shoulder, passed out soon after entrance. Deceased was dead when examination was made.

*Cross-examination.*—Two shot passed through. They passed a little down from where they struck the joint of shoulder, as if they ranged towards the bosom. The face of deceased, from the wounds, must have been in the last direction—if the face had been turned the other way, the wounds would have been in the right side.

TESTIMONY FOR DEFENCE.— *Willis A. Hawkins,* sworn.—Says defendant and himself went up to Monroe's office, solving some algebraical problems, and between seven and eight o'clock in the morning Monroe attracted attention of witness, and witness saw deceased walking in direction from store to jail, with a gun in his hand—thinks it was a yauger. Deceased made no hostile demonstrations, except from his looks. He looked angrily and looked constantly at prisoner's office. Prisoner saw deceased at this time. When witness saw deceased he was walking with gun in hand, and sometimes with butt on his foot. Witness and deceased were on friendly terms. Deceased walked from store to jail, and stood there some time—a minute or two—and did not change his position only to look towards the prisoner's office, and back the other way. Witness then walked into office and took a position by window and looked at deceased. Deceased then came up, making about the same demonstrations as when he went down. Witness came out from office and left prisoner there; prisoner then remained there till 10 or 11 o'clock. Prisoner was in a position to see deceased when deceased went into court house, and prisoner was looking in direction of the court house. Deceased was standing in court house at window with gun in hand, looking towards prisoner's office; window partially open and deceased stood at window five minutes. Witness and prisoner were both looking the same way towards court house. The most violent demonstration witness saw on part of deceased, was at store in the morning. Witness was standing in piazza of store with Hall, with faces towards court house. Deceased came from court house, and took position in front of piazza with face turned towards prisoner's office. Deceased was gritting his teeth—witness made some remark, but deceased did not appear to hear; made no response but walked round piazza, with eyes still towards prisoner's office. Deceased remained standing but a few moments and then walked round to end door and took a seat on steps—would not be positive about taking a seat. Gun in hand

all the time, as long as witness saw him, near to prisoner's office. Witness and prisoner were in the habit each day of studying together.   Witness and Smith went to deceased when he fell.   The yauger was by deceased's side—was cocked and triggers sprung. Two pistols were found on deceased's person, one was a duelling pistol, and loaded with a ball.   The other, a common one.   Gun and larger pistol were loaded; they were fired off and ball entered a block.   Witness saw small pistol shot at same block, but saw no sign of a bullet.   The smaller pistol was in deceased's coat pocket, the other in his bosom.   Several vials of laudanum were in pockets of deceased, one a large one, holds about a gill.  Can't say whether or not deceased was an expert shot.   Can't say whether gun was a good one.   Deceased when he fell, was nearer the store than he would have been in a direct route to Post Office.   From where he fell, witness would suppose he was going into end door of store.   Witness saw two men take out deceased to talk with him---two men were Majors Clark and Perry.  Don't know whether or not these men were friends of deceased.  When Major Clark took deceased off prisoner could not see deceased; they conversed 15 minutes at time with Major Perry.   Can't say whether prisoner could see deceased.   When witness next saw deceased, deceased went to his office and got his gun.   Deceased then walked towards P. Monroe's.   Thinks prisoner could have seen deceased at this place.   Deceased then held his gun in hand with butt on foot, taking position with china tree between him and prisoner's office, then walked to store.   Prisoner could have seen deceased.   Deceased beckoned towards prisoner's office as if he wanted some one.   George Monroe, who was at prisoner's office, went out to him, deceased.   After dinner saw prisoner in piazza of Tilman's store.   There was no back door to Tilman's store, and prisoner could not get out that way without going out the window.   From the china tree, deceased could have killed prisoner if the gun had been as good as represented.   Deceased looked from china tree as if looking towards prisoner's office ; remained there but a few minutes, and walked over towards Tilman's store, and back again towards prisoner's office, and George Monroe came to him.   The post office was so situated that deceased could have seen George with gun going to prisoner's office.   Deceased walked in haste after getting his gun, to china tree.   China tree was in route of prisoner from office home, Deceased could have

Monroe *vs.* The State of Georgia.

killed prisoner, if the gun was as good as represented, and deceased was as good shot as represented, from court house, in route from prisoner's office home, the distance 70 or 100 yards. Witness did not tell prisoner things that had occurred in the morning on part of the deceased.

*Cross Examination.*---When deceased passed the office of the prisoner, prisoner was sitting near the fire place, in one corner of the room, as deceased passed. Prisoner went both to the door, and window of the office and looked out. Can't say that he took his chair and sat in the door after the interview between George Monroe and deceased. The interview took place near 11 o'clock, A. M. Prisoner called by Smith's when he, prisoner, went to dinner; had the gun with him, it was about 12 o'clock. Prisoner was not in the habit of carrying his gun about town. Can't say that prisoner once came into the piazza, or just came to the door of the store at time of shooting. Thinks deceased was leaning against a china tree with butt of gun resting upon the ground. At the time deceased passed the office door of the prisoner, witness was between the door and the prisoner. Prisoner did not expose his person in the door when deceased was near by, or below Tilman's store. Sometimes prisoner would look out of the door without exposing his person.

*C. W. Applewhite,* sworn.---Says he was present at the time of killing---saw the gun in the hand of the prisoner---it was cocked. Put his hand upon it, and was told by prisoner he could take care of her. Saw deceased between 75 and 100 yards of store, coming in direction of Tilman's store; about this time stopped and put his left hand up to his gun, as if to cock it, and it stayed up long enough to have cocked it. Was not sure if prisoner had seen deceased or not. Prisoner was in a position that he could have seen deceased if he had looked. Saw prisoner look out a time or two before he moved from there. Just before he moved, he, prisoner, cocked his second barrel, and remarked, "that this gun has got good springs," the prisoner then stepped to the front door. Can't say he stepped out, prisoner then retreated back. Stepped out again and said, "now if you want to shoot, shoot." As the words came out of his mouth, witness turned around, and prisoner fired. Saw the back of prisoner as he heard the fire, witness then walked to the door, saw deceased and remarked to Johnson, that deceased was a dead man. Johnson and witness went out to the body of deceased. Mr. Hawkins

picked up the gun of deceased, the gun was cocked. Witness and Johnson were standing near the end door when the gun fired, whispering to each other. Deceased was coming to the store of Tilman, with a gun; thinks prisoner went out in open view when he fired. Is a quiet and peaceable man. When deceased went into the court house, he went into the south door passing out at the north door, going over to east side of the square and passed down to Tilman's again. Prisoner could not have seen deceased all the time, on the east side of the street. Could have seen him from his, prisoner's office, occasionally through the fence. Did not know what time deceased left the corner. Witness was at the store, when George Monroe carried prisoner the gun. Deceased came over to his, deceased's office, in haste, and brought his gun out. The gun of deceased, was at the office of deceased, on the way from the residence, to the office of prisoner. Deceased came out with his gun and went up the street, after George Monroe; made a halt at Philip Monroe's—after a little, passing over to Tilman's corner. All this was in full view of office of prisoner.

*Cross-examined.*—Witness and deceased were partially unfriendly. The presence of witness did not make deceased look mad. Witness went to his house once, during the morning. When deceased put his gun in his office, and went to post office, the affair was stopped ten or fifteen minutes. When deceased came over from the post office, he went up after George Monroe; staying a short time at Philip Monroe's. Deceased passed on to Tilman's corner and beckoned to George Monroe. Witness was at Philip Monroe's corner, when deceased and George Monroe had the interview, and occasionally looked towards the office of prisoner. Does not recollect to have seen the deceased and George Monroe separate, after the interview, which was near the corner of Tilman's store. Can't say what was the position of George Monroe, but the deceased faced the office of prisoner. Deceased and George Monroe went past the house of witness, in company, about 12 M.—the deceased soon passing back to Tilman's corner. Thinks he has told sketches of what he would swear, to some person—has talked with Major Clark and Short—does not, recollect to have talked with any of the Counsel in this case, but Mr. Hawkins. Witness thinks he told Mr. Hains, first, that deceased put his left hand up to the gun, the gun was on the right shoulder. Could not tell if it was a gun or a hand-spike, could

Monroe *vs.* The State of Georgia.

not see the cock or triggers then, from the distance that deceased was from witness. Does not recollect that he told Short or Hains about the killing. Kersey may have been present. Can't say he ever had any conversation with Kersey about it. Can't recollect if he ever told any person about cocking the gun—will not say in the positive, that he told G. Smith about the cocking. Does not recollect whether Hains was the first person he talked with or not. Cannot think that he told Tilman, that he, witness, did not see deceased when he was shot, until he was killed; if he did it has escaped his recollection.

*Griffin Smith*, sworn for defence.—He went up to Tilman's store, on the day of the difficulty—deceased was at Tilman's— prisoner was in his office. Saw deceased at the corner, and stood about the corner some time, and had a yauger a portion of the time; held the yauger in his right hand, lying across his left arm, and appeared to be mad. Prisoner was in full view of deceased, and would occasionally appear at the door, and step back. De- ceased was looking intently at the office of prisoner. Deceased was in ill humor, looked mad, and had his gun, and occasionally grit his teeth. Saw deceased come to the court house, thinks he did not see deceased look out of the window. Deceased then went back to Tilman's corner, looking in the direction of the of- fice of prisoner. Did not see deceased get far beyond the farther corner of Tilman's store. Prisoner could see deceased from his of- fice to court house. Deceased continued about the corner till about 12 o'clock M. Witness was at home at the time of the killing— went immediately to the place, and met prisoner. Prisoner said he gave himself up to the laws of his country. Witness is a member of the Inferior Court. The gun was lying by his, de- ceased's, side, cocked and triggers sprung. Saw upon the body of deceased several vials, labelled laudanum.

*Daniel Tilman*, sworn.—Was in town on the day of the kil- ling, attention of witness was drawn to the difficulty, about 10 o'clock, A. M. first saw deseased in front of witness' store or about the corner walking about, sometimes in front, sometimes at the corner and sometimes at the end. Was armed with a yau- ger, seemed to be looking toward the office of prisoner. Priso- ner was in his office, as he, witness, saw him come to the door oc- casionally and look out. Did not see deceased point his gun at any thing; prisoner could have seen deceased all the time, except

when deceased was taken off by his, deceased's, friends, when he would soon return.    Deceased looked in a very ill humor, as much as he ever saw a man, and staid about the corner off and on until about 12 M. deceased left and went to his home.    Prisoner did not leave his office till after deceased went home.    Witness went to his dinner, and after a little prisoner came in ; prisoner was in the habit of calling at store of witness.    There was nothing remarkable in prisoner's calling at the store of witness that evening.    Deceased frequently called at the store of witness to buy small articles, but did not frequent the store of witness. Knows of no other person around the corner, but prisoner, with whom deceased was on bad terms.

*Cross-examined—*There was a bad state of feeling existing between Smith and deceased ; does not know that deceased was about the corner until 10 A. M.    Prisoner was not in the habit of calling at the store of witness in the afternoon with a loaded gun cocked; was not in the habit of calling at the store of witness and peeping out first one door and then the other.    Witness and prisoner came from dinner in company ; prisoner had his gun, this was not frequent, it was not his habit, although he sometimes did it.    Witness has no certain hour to go to post office, was not in the habit of going away from his store to write letters, went to Ticknor's and while there wrote the letter ; this was as witness thinks between two and three o'clock.    Thinks he remarked when he came back to the store and found Macon dead, that it was the best act of Monroe's life, that the people ought to take him to the creek ; might have said that if he were in prisoner's place he should feel no more compunction of conscience than if he had killed a dog.    Witness and deceased were not on good terms, did not consider that he and deceased were upon terms of friendship at all, did not leave his store to avoid seeing deceased killed.    The attention of witness was first attracted to deceased about the time that George Monroe carried the gun to prisoner, but thinks it was before, is more of the opinion that it was before —can't say that at the time George Monroe carried the gun deceased had put up his gun, does not recollect to have seen deceased any more after the interview with George Monroe, which was probably before 12 o'clock ; when witness came out to go to dinner, deceased was gone.    Witness then inferred that he had gone to his, deceased's, dinner, does not recollect to have seen

deceased in conversation with any person on Philip Monroe's steps; witness thinks he went to dinner between 11 or 12 o'clock, and was not not gone more than an hour, might have remained some minutes before he went to Ticknor's, thinks it might have been twenty minutes or less before he left for Ticknor's, was gone to Ticknor's an hour and a half or less, can't say how long, can't say what prisoner done in store of witness after he got there from dinner, he may have sat down, can't say what he did. Witness has aided to employ one counsel in defence of the prisoner. Had a conversation with Applewhite yesterday, but none up to yesterday as well as he recollects, does not recollect what time he had the conversation with Applewhite, does not recollect whether it was before or after breakfast, before or after dinner, is certain it was not after supper. Cannot say which spoke of the cocking of the gun, Applewhite or witness.

*Re-examined by Defence.*—Witness meant to say when he said no person was present with whom deceased was unfriendly, that there was no one present between whom and deceased there was actual bad feeling, or against whom deceased was enraged; when witness said that prisoner went to his store in his usual way he meant that prisoner was in his usual calm and peaceful temper.

*George Monroe,* sworn, says, took a double-barrel gun to prisoner at his, prisoner's, office; on his way from residence to prisoner with gun, saw deceased at post office and looked at witness and then started across the square, so as to meet witness about the deceased, and passed over the square in a very quick pace, his attention directed to witness. As witness was in front of deceased's office, and deceased on the north side of the road opposite, two carriages passed the road, by which time witness had proceeded up the street to the grocery of P. Monroe; passed on and in looking back saw deceased coming after witness with a gun. When witness arrived at the piazza of prisoner's office, he saw deceased behind a china tree at P. Monroe's corner, his body behind the tree, his look fixed upon the office of prisoner, his gun resting upon the ground or on the foot of deceased, the barrel by his, deceased's, side. The next time witness saw deceased the deceased was at a post of Tilman's piazza with his gun in nearly the same position before mentioned, and beckoned to witness and put his gun over his, deceased's, shoulder, and commenced walking the piazza. Witness coming over and passing the usual salutation with de-

ceased, witness stepped close up to the deceased, and remark-ed, I am very sorry to see you so hostile to brother Edward. Deceased said, I do not know what right any one has to say that I am hostile to your brother. Witness replied that prisoner, brother Edward, said that he, deceased, was carrying that gun for him, and that he deceased, had been trying several times that morning to shoot him, prisoner. Deceased replied that prisoner must have come to that conclusion from the fact that he, deceased, had taken his gun out of his office. Deceased said he had a right to carry his gun, and was in the habit of carrying it to kill birds and other things with it, and no one could prevent him. Deceased then asked what he, witness, had taken the gun to prisoner's of-fice for? Witness told him he had carried it to prisoner to de-fend himself from an attack of deceased, in case of an attack. The attention of witness was then attracted by the gritting of the teeth of deceased, while he, deceased, in a fierce manner remarking that he would fight prisoner any way but a fist and skull fight, that he would give the prisoner one of his pistols, taking one, the smaller one, from his pocket, and offering it to witness, and he would meet him, prisoner, with the other, or tell him to come out with his double-barrel gun, I will allow him a fair chance, and dev-il take the hindmost. Witness then told deceased that prisoner would not injure him, deceased, only in case of self-defence. De-ceased then spoke of Tilman's having a double-barrel gun in his store for prisoner to shoot him, deceased, with; witness replied, if it was the fact, it was under an apprehension of an attack from him, deceased. The gun was for the defence of prisoner. De-ceased said, if Dr. Monroe comes out of that office with that gun I intend to pop him—I will pop him right between the eyes. Deceased said something about prisoner's coming out without the gun, cannot say what. Witness said if prisoner came out with the gun, it would be for defence, in case you, deceased, attack him. Deceased said he was not sure of that, and if he does come I will pop him between the eyes. Witness admonished deceased not to do it, as it would hang him and disgrace his family, and to put up his gun. Deceased replied that was his business. Wit-ness then asked the cause of his animosity to prisoner. He re-plied don't you know he is my prosecutor in all these cases against me? Witness replied that he did not know that he, prisoner, was his, deceased's, prosecutor. Deceased then told witness to

tell prisoner he was a liar, a rascal, and a coward. Deceased said he could send prisoner to the penitentiary. Witness advised him to do so, and not seek satisfaction in any other way. Deceased said no, he did not believe the law should have any thing to do with such difficulties as that; he, deceased did not settle his difficulties in that way, existing between him and prisoner, and refused to reveal his intentions towards prisoner, and went on to tell in how many cases he had befriended prisoner, and mentioned the case of prisoner and Dr. Steel. That he had regarded him, prisoner, as his, deceased's, best friend, and had nothing that he would deny prisoner. Said something about the prosecution of the cases, and said prisoner must have consented to become prosecutor, or the Court would not have appointed him, and repeated his charges of cowardice, &c. During this conversation deceased kept his eye fixed upon the office of prisoner, pointing, and grating his teeth. Witness and deceased then separated. At home, or after dinner, witness told prisoner what deceased told witness about popping him between the eyes. Deceased and witness passed towards the corner of Mr. Smith. Witness saw prisoner in the door of his office. Deceased in alluding to prisoner, would point back to prisoner's office while prisoner was in the office door. This was about 12 o'clock, and witness and deceased separated.

*James Marchman*, sworn, saith, he saw Mr. Macon on the morning of the killing in the corner of Tilman's piazza, nearest the office of prisoner, pointing his gun in the direction of prisoner's office; the gun was up to his face; rather thinks Macon's body was concealed from the office of defendant, his head being in such a position as to enable him to see prisoner's office. Afterwards, George Monroe and deceased walked down by Smith's. Deceased then returned by Philip Monroe's grocery, and took his seat on the steps of the grocery, from three quarters to an hour; had his yauger with him. This was in the walk usually from prisoner's office to his residence. Macon then walked to Tilman's, remained there two or three minutes, and then went to his residence.

*Cross-examined.*—The steps occupied by Macon at Monroe's grocery were those nearest Smith's. The pointing of the gun was before Macon and Monroe were together.

*Mrs. S. Hawkins*, sworn, saith witness was in town the day

Macon was shot; saw him pointing his gun in the direction of Monroe's office about 10 o'clock, A. M. Macon was where he could see Monroe's office. Witness did not see Dr. Monroe. First saw him, Macon, in the Court-House; went direct from Court-House to Tilman's store; had the gun up to his face. Macon was standing at the corner of Tilman's piazza, near the boxes, his head was in view of the office, his body behind the boxes, holding the gun up; he looked towards Smith's and then took the gun down. Don't recollect seeing any one else on the Court-House square. There was no one in the piazza in which he was standing.

*Cross-examined.*—Mr. Macon was in the part of the piazza fronting the Court-House near the boxes. The boxes were against the house; thinks they were near the south-west corner of the house. Witness stepped out to see if he was going to shoot.

*John S. Johnson, recalled.*—Had been in the habit of selling Macon laudanum; some since he, witness, has been doing business for Tilman since January. Witness sold Macon a bottle of laudanum two or three days before Macon was shot; about a gill or less. Thinks the place he last saw Macon (before shot) was from twenty to forty feet from where he fell. The gun in the position as described in his direct examination. Macon bought nothing from Tilman's store that day as he recollects; had no business there as he knows of. Witness had said, thank God, they could not make a witness of him, as he had not seen anything, meaning he had not seen the shooting, and did not consider he had anything which would be material. Dr. Monroe did not come to Tilman's store till evening; did not buy anything, and had no business that he, witness, knows of.

The testimony here closed.

During the examination of Willis A. Hawkins, one of the witnesses for the defence, the counsel for prisoner proposed to prove by said witness the declarations of prisoner while in the office with witness at the time deceased came by the office in the morning with his gun, going to show that prisoner was alarmed and apprised of the intention of deceased to attack him, particularly to prove the declaration of prisoner at that time, as follows, to wit: "Yonder comes Macon now, with his yauger; he intends to shoot or kill me." Which testimony the presiding Judge reject-

ed, and to which decision of the Judge the defendant by his counsel excepted.

Defendant's counsel also offered to prove by said Hawkins, that when deceased was in the Court-House at the window, defendant said to witness, don't you see Macon at the window trying to shoot me? Which testimony was rejected by the presiding Judge, and to which decision defendant by his counsel excepted.

Defendant's counsel also proposed to ask said Hawkins why he left the office where he and prisoner were on that morning, with the view of bringing home the knowledge to the prisoner of the conduct of deceased on that occasion, his violence, anger, threats, &c. Which evidence was rejected by the presiding Judge, and to which decision defendant by his counsel excepted.

Defendant's counsel proposed to prove by said Hawkins, that defendant told him, Hawkins, that he, prisoner, had seen the conduct of deceased, (as described by witness in his testimony as taken down by the Court,) after it occurred in the morning, and before the shooting took place. Which testimony was rejected by the presiding Judge, and to which decision the defendant by his counsel excepted.

Defendant's counsel proposed to prove, by Griffin Smith, one of the witnesses for defence, that he, witness, had seen deceased make an attack with deadly weapons, within six months, upon prisoner, that prisoner fled at that time so hastily as to leave his cloak, until he, prisoner, had got beyond the reach of the arms of deceased; which testimony was rejected by the presiding Judge, and to which decision defendant by his counsel excepted.

Defendant's counsel also proposed to prove by said Smith, a continued series of threats, commencing at the time of the returning of the true bill, at the fall term of the Superior Court, of Lee county, in 1847, followed up by repeated acts of violence, up to the time of the killing, by the said deceased, against the prisoner, expressing a determination on the part of deceased to take the life of prisoner before the Spring Term of said Court, in 1848. Which testimony was rejected by the presiding Judge, and to which decision defendant, by his counsel, excepted.

Defendant's counsel proposed to prove, by said Smith and others, that deceased was a rash, violent, bloody-minded man, in the habit of taking secretly the advantage of his adversaries in per-

sonal contests, and not willing to give his adversaries a fair and equal chance, and that prisoner was well acquainted with his character as such; which testimony was rejected by the presiding Judge, and to which decision defendant's counsel excepted.

Defendant's counsel also proposed to prove by said Smith, that on the morning of the day on which the killing took place, after the violent conduct of deceased on that morning, and before the killing, defendant consulted with said Smith as a peace officer, as to the propriety of binding deceased over to keep the peace, and that said Smith advised him not to do so, as it would only enrage deceased and make him more violent, and would do no good, as deceased could give the bond, and it would not restrain him from violence; which testimony was rejected by the Court, and to which decision defendant, by his counsel, excepted.

Defendant's counsel offered to introduce an order of the Inferior Court of Lee county, appointing prisoner prosecutor of deceased for embezzling the poor-school fund of said county, as treasurer of the poor school fund of said county, andalso the bill of indictment against said deceased for embezzlement of said funds, prisonerbeing prosecutor; which testimony wasrejected by the presiding Judge,and to which decision the defendant's counselexcepted.

Defendant's counsel proposed to prove by said Smith, that prisoner was one of the said Inferior Court of said county; which testimony the presiding Judge overruled and rejected, and to which the defendant's counsel excepted.

Defendant's counsel also proposed to prove by Elijah Warren, one of the witnesses on the part of the State, threats and acts of violence of deceased towards prisoner at various times between the adjournment of the fall term of the Superior Court of Lee county, 1847, and the killing of deceased; which testimony was rejected by the presiding Judge, and to which decision the defendant, by his counsel, excepted.

Defendant's counsel were also prepared to prove, by Samuel C. Wyche, William Bodiford, Elijah Warren, Clifford Monroe, and L. P. Cock, and others, that at the time the bill of indictment against deceased, for embezzlement, at the previous fall term, was read, the said deceased was heard to declare that the prosecutor of said bill, (who was the defendant,) should not live till this term of said Court, and be at Court to prosecute the same, and that threats of this and the like character, accompanied with acts demonstrative of a fixed determination to carry them into

execution, were made by deceased up to the day of the killing. That the acts were such as prowling around the residence of defendant with fire arms, walking by the house with pistols and gun, and watching intently the while, as if for an opportunity to carry his threats into execution. That defendant, alarmed by such demonstrations, had kept close to avoid exposure, and often visiting his patients by night stealthily, rather than expose himself by day to the danger of a rencounter with deceased. That these demonstrations had been so frequent and notorious, until it had become the universal opinion of the neighborhood and citizens, that he, deceased, would kill the defendant. But all of which evidence, by the stringent rule adopted by the presiding Judge, rejecting the testimony already offered, as to the threats and violence of deceased, was excluded; and to which defendant's counsel believe they have a right to except.

After the testimony for the State and prisoner had been closed, and the cause argued by counsel on both sides, the presiding Judge, his Honor, Lott Warren, charged the jury, among other things, in substance as follows : " That the Court greatly doubted the propriety of his having admitted for the consideration of the jury, the testimony showing any of the conduct of either deceased or prisoner on the day of the killing, except that which occurred immediately at the time of the killing, but that as the Court, had admitted the testimony of their conduct during the morning, the jury were bound to consider it in making up their verdict. And that it was a source of much gratification to the Court that we have a supreme Court for the correction of errors, often committed for want of time and opportunity to investigate cases on the circuit, and that if this Court has improperly rejected evidence offered for the defendant, and it should be necessary, he can take the case up and have the error corrected." To which defendant by his counsel excepted.

The jury retired to their room, and after consulting upon the case, about nine o'clock on Saturday night, brought in a verdict of guilty.

Defendant, by his counsel, moved before his Honor Judge Warren, for a new trial, on the following grounds, to wit :

1st. The jury found contrary to law.

2d. The jury found contrary to evidence.

3d. For grossly improper conduct on the part of the jury du-

ring their deliberations on said cause, as shown by the accompanying affidavits.

4th. That the jury dispersed after being impannelled and sworn to try said cause, and even after they had received the charge of the Court, and before they had made up their verdict. The jury who tried said cause, frequently after they had received the charge of the Court, and retired to deliberate upon their verdict, left the jury room through the back door, sometimes one, and sometimes more than one at time, and retired from the jury-room from fifteen to twenty minutes at a time, in the dark, unaccompanied by the Sheriff or his deputy, or any lawful bailiff, and out of their sight and persons were lurking about and around the jury-room from which the jury as aforesaid, retired, as aforesaid, which jury being in a room on the lower floor and of easy access to persons who were without.

5th. The Court erred in refusing to allow the defendant to prove, that as a Justice of the Inferior Court of this county, and at the request of his associate Justices, he had and did, at the last term of this Superior Court, become the prosecutor of the deceased for embezzling, as treasurer of the poor school fund of said county, the poor school fund of said county, and that in consequence of said prosecution of said deceased, and after the finding of the true bill by the Grand Jury against said deceased, said deceased, at that term of said Court, had said he, meaning defendant, should not be at the next term of said Court to prosecute deceased, for he, deceased, would kill him and put him out of the way before the next term of this Court. And that deceased often threatened to kill him, defendant, between the adjournment of the last term of this Court and the killing, and had, on several occasions, attacked defendant with deadly weapons, and that defendant had always declined a rencontre with deceased, till the fatal rencontre that resulted in the death of deceased, and which threats had come to the knowledge of defendant.

6th. For that the Court erred in refusing to allow witness Hawkins, who testified on the stand, to state what defendant said, and what manifestations of alarm he showed, when deceased passed by his office in the morning of the rencontre, with his yauger rifle, and which would have gone to show that defendant stood in fear of his life from deceased, he, prisoner, saying, "yonder comes Macon now, and he intends to shoot me."

7th. For that the Court erred, in refusing to admit the testimony of Griffin Smith, and Willis A. Hawkins, by whom defendant's counsel offered to prove, that defendant, about dinner time of the day of the recontre, told Hawkins and Smith of the conduct of Macon towards him, (defendant,) during that morning, and asked the propriety as to his taking out a peace warrant for deceased, and was told by them that in their opinion, it would only make him more reckless.

8th. For that the Court erred, in charging the jury that he greatly doubted the propriety of his having let in for their consideration, the testimony showing any of the conduct of the parties on that day, except that which occurred immediately at the time of the killing, because it was calculated to induce the jury to discard it from their minds, although the Court also charged them that they were bound to take it into consideration in their deliberations—and because if the counsel for defendant had known that the Court would have expressed such doubts, they would have introduced other evidence of the conduct of the parties at the time of the shooting.

9th. For that the Court erred, in charging the jury that if the Court had erred in rejecting testimony that might have been of service to the defendant in his defence, that the defendant could carry that error to the Supreme Court, and have it corrected, because it was calculated to impress upon the mind of the jury, that in consequence of rejection of the testimony the defence was not made out.

10th. For that one of the jurors who was in favor of conviction as strongly expressed by him, took out of the juryroom in the dark, out of sight and out of hearing of the other jurors, another juror, who was equally strongly opposed to a verdict of guilty, as expressed by him before he went out of the room, where said two jurors had a private conversation, (no one being present but themselves,) of some twenty or thirty minutes duration; after which they returned to the jury-room, and the juror, who was opposed to a verdict of guilty when he went out, immediately on his return to said room consented to a verdict of guilty.

11th. For that one of the jurors who sat on the trial of defendant, to wit: William Stanley, had formed and expressed an opinion in relation to the guilt of the defendant, declaring his belief of his guilt before he was sworn as juror, as will appear from ac-

companying affidavit; and that this fact has come to the knowledge of the prisoner since the verdict was rendered.

12th. In that the Court erred, in not allowing the prisoner to prove the violent and vindictive character of deceased; and that he always, in personal difficulties with his enemies, sought unfair advantages of them.

13th. For that the Court erred in charging the jury at all, not having been requested by any of the jurors to do so.

And the above grounds of motion for a new trial being argued were overruled, to which decision defendant by his counsel excepted.

Judgment was then entered up, and sentence pronounced upon the prisoner. Whereupon the defendant, by his counsel, excepts to all the above stated decisions in said cause, and for a specification of error assigns the following:

1st. The Court erred in refusing to allow defendant's counsel to prove by Willis A. Hawkins, the declarations of prisoner while in the office with Hawkins, when deceased went by in the morning with his gun, going to show that prisoner was alarmed and apprised of the intention of deceased to attack him, prisoner, and particularly, that prisoner said, "Yonder comes Macon now with his yauger, and he intends to shoot or kill me."

2d. The Court erred in refusing to allow defendant's counsel to prove by said Hawkins, that when deceased was in the court house, at the window, prisoner said to witness, "don't you see Macon at the window trying to shoot me."

3d. The Court erred in rejecting the statements of Hawkins as to why he left the office where he and the prisoner were on the morning of the killing, with a view of bringing home to the prisoner the knowledge of the conduct of the deceased on that occasion, his violence, threats, anger, &c.

4th. The Court erred in refusing to allow defendant's counsel to prove by Hawkins that prisoner told him, Hawkins, after the violent conduct of deceased in the morning, (as described by said Hawkins in his testimony as taken down by the Court,) and before the shooting, that the prisoner had seen the violent conduct of deceased.

5th. The Court erred in rejecting all the sayings of the prisoner made during the morning of the killing and before the killing, and during the violent conduct of deceased, and which would show that prisoner knew of said conduct.

Monroe *vs.* The State of Georgia.

6th. The Court erred in refusing to allow prisoner's counsel to prove by Griffin Smith, that deceased, in 1848, within the last six months, had made an attack with deadly weapons upon prisoner, that prisoner fled at that time so hastily as to leave his cloak, until he, prisoner, got on his horse and out of the reach of the arms of the deceased.

7th. The Court erred in refusing to allow prisoner's counsel to prove by Griffin Smith, Samuel C. Wyche, Isaac P. Cock and William Bodiford, a continued series of threats, followed up by acts of violence, from the adjournment of the fall term of the Superior Court of Lee county in 1847, up to the time of the killing, by the said deceased, against the prisoner, showing a determination on the part of deceased to take the life of prisoner before the spring term of said Court in 1848.

8th. The Court erred in refusing to allow prisoner's counsel to prove by Griffin Smith, that deceased was a violent, rash, and bloody-minded man, in the habit of taking advantage of his adversaries in personal contest, and that prisoner was well acquainted with his character as such.

9th. The Court erred in rejecting all evidence of the violent, vindictive, and dangerous character of deceased, and which was known to prisoner.

10th. The Court erred in refusing to allow defendant's counsel to prove by Griffin Smith, that on the morning of the day on which the killing took place, after the violent conduct of deceased on that morning, and before the killing, prisoner consulted with said Smith, as a peace officer, as to the propriety of binding deceased over to keep the peace, and that said Smith advised him not to do so, as it would only enrage deceased, make him more violent, and would do no good, as deceased would give the bond and it could not restrain him from violence, but make him more reckless.

11th. The Court erred in rejecting as evidence, the order of the Inferior Court of Lee county, appointing prisoner prosecutor of deceased, for embezzling the poor-school fund of said county as treasurer of the poor-school of said county.

12th. The Court erred in rejecting as evidence the bill of indictment against deceased, for embezzling the poor-school funds of Lee county as treasurer of the poor-school of said county.

13th. The Court erred in refusing to admit evidence that pris-

oner was one of the Justices of the Inferior Court of said county.

14th. The Court erred in refusing to allow prisoner's counsel to prove by Elijah Warren, one of the witnesses on the part of the State, threats and acts of violence on the part of deceased toward prisoner at various times, between the adjournment of the fall term of the Superior Court of Lee county, 1847, and the killing of deceased.

15th. The Court erred in refusing to allow the counsel for prisoner to prove by Clifford Monroe, that deceased had been prowling around the residence of prisoner at various times since the first threat made to I. P. Cock, on return of the true bill, with his gun, and watching the house intently, and that on one occasion she saw him hide behind an ox-cart, near the house, as if way-laying prisoner.

16th. The Court erred in overruling the motion made by defendant's counsel for a new trial, upon each and all the grounds embraced in the rule for a new trial, which were taken by said counsel.

*Affidavits filed and submitted to the Court, with the notice for a new trial.*

GEORGIA, LEE COUNTY.—Personally came before me, William G. Heald, who, being duly sworn, deposes and says that he was one of the bailiffs having charge of the jury who tried the case of *The State vs. Edward V. Monroe,* on Saturday night last—that the jury retired after the cause had been given them in charge by the Court, to a private room in Starksville which had two doors, one in front and the other opposite behind, no shutter to the front door, the back door could be seen from the front door, by any person standing in the street in front of the house, that when it was getting to be dark, deponent proposed to go after candles, did it, leaving bailiff Levining in charge of the jury while he would be gone, and remarking in presence of the jury, that they knew that the Judge had strictly forbade them to speak to any body—when deponent returned, some of the body told him that some of the body were out and he had better bring them in —deponent looked out of the window and saw two of the jury out at the end of the house conversing very low, so that deponent could not tell what they were talking about; saw that one of them was captain Blake, and said to him, captain you had

better come in the house—said he would presently or something to that amount—in a few moments they both came in—this was about the time deponent had lighted a candle. Deponent walked backward and forwards before the front door, and some of the jury called for water—deponent went in the room and handed out the bucket to the other bailiff to go and get some—the other bailiff said to deponent, "there must be somebody talking behind the house." Deponent then went into the back room and saw two of the jurors coming in. Blake was one of these jurors, and when he came in, another juror remarked, that he wanted to go out and consult with him too. They walked out at the back door and soon returned, but while out they were out of the view of this deponent. Deponent then went out of the back door himself, and took a position behind a china tree, to watch and see if any body was about. No body came about during the minute or two he staid there—walked round the house and went back to the gate, opposite the front door—sent Levining to order somebody off once or twice—that in consequence of deponent's meeting with delay in being able to procure a candlestick and candle of Philip Monroe, there being such a crowd there, he must have been absent from the jury-room after the light, some smart length of time, but deponent cannot say how long; and during his absence the jury was under the care of bailiff, Levining, and cannot say what transpired during his absence.

Sworn to and subscribed in open Court, this 29th May, 1848.

[Signed]     WILLIAM GRIGG HEALD.

GEORGE C. TICKNOR, *Clerk.*

GEORGIA, LEE COUNTY.—Before me personally came Joshua Levining, who being duly sworn, says, that he was one of the bailiffs in charge of the jury, who, in the Superior Court of said county, tried the case of the *State of Georgia vs. Edward V. Monroe*, for murder, and rendered their verdict of guilty, on Saturday night of last week; that the room in which the jury deliberated, was a private house, having no upper stories, and but two rooms, one front and back door, that the back door was leading into a corn field, that frequently, during the deliberations of said jury, after they had received the charge of the Court, in said case, and before they made up their verdict, the jurors, one, two, and as many as three at a time, left the room through the back door

of the house or room, there being no shutter to the front door, he thinks, none to the back door, and unaccompanied by any sheriff, deputy sheriff, or bailiff, and in the dark, some of them being absent from the jury-room, so alone, for and during some fifteen or twenty or thirty minutes at a time; that at the commencement of the deliberations of said jury, some of the jury declared they never would agree to find the defendant guilty, others declared they never would agree to find him innocent, which deliberations were heard by this deponent. On one occasion, during said deliberations, one of the jurors, who had expressed himself decidedly in favor of acquitting the defendant, and one who had expressed himself as decidedly the other way, at the solicitation of the juror in favor of a conviction, left the jury-room, and went out, where witness saw them conversing secretly, but did not hear or understand any thing they said, it was in the dark too —while they were thus holding their private conversation in the dark, by themselves, and which lasted some twenty or thirty minutes, another juror came out to them, where they were talking, when one of them, and he thinks Mr. Blake, who was in favor of convicting the defendant, told the other juror who had approached them, to go back, which he did; the two first jurors that were out continuing their conversation; and when at the expiration of some twenty or thirty minutes after they first went out, the two jurors went back into the jury-room; the juror who was for acquitting the defendant when he went out, agreeing when he came in, to sign a verdict of guilty—at and during a part of the time of the said conference of the two jurors, they were out of sight of this deponent—there being a number of persons about and around the jury-room, who were not jurors—and who, this deponent was exerting himself to keep away. Two of said persons so lurking about said jury-room, to wit: Alfred Kersey and Wm. Corkadale, cursing this deponent, and swearing they were in the public streets, &c. &c. This deponent further says, that during the deliberations of this jury, all the jurors were hardly ever in the room at the same time; they kept going out at the back door, out of sight sometimes for twenty or thirty minutes, and returning through it and the front door. There seemed to be less cool deliberation, and more excitement and confusion than I ever saw before in a jury room, and especially among many or several of the jurors—some of them deporting themselves, so

much so, that it was remarked by one of the bailiffs, that they were more like bees starting to swarm.

Sworn to, and subscribed in open Court, 29th May, 1848.

[Signed]     JOSHUA LEVINING.

GEORGE C. TICKNOR, *Clerk.*

*Lee Superior Court, May Term,* 1848.

GEORGIA, LEE COUNTY.—In open Court, personally came Jesse Tucker and Calvin King, who being duly sworn, deposeth and saith, that they heard William Stanley, one of the jury, who tried the cause of the *State vs. Edward V. Monroe,* charged with murder, and tried at this term of the Court, and a verdict of guilty, say on the Sunday evening preceding the first day of this term, that from what he knew, he'd stretch the prisoner, alluding to his character as a juror, he, then, having been summoned to appear at this Court as a petit juror, and then went on to say in substance, that the prisoner was guilty of wilful murder. All this occurred before the said Stanley was taken and sworn in said case.

Sworn to, and subscribed in open Court, 29th May, 1848.

[Signed]     JESSE TUCKER.
             CALVIN KING.

GEORGE C. TICKNOR, *Clerk.*

*Lee Superior Court, May Term,* 1848.·

GEORGIA, LEE COUNTY.—In open Court, personally came *Edward V. Monroe,* who being duly sworn, says, that he never knew or heard of the fact set forth in the affidavit of Jesse Tucker and Calvin King, as to the formation and expression of an opinion by the juror, William Stanley, previous to his being taken, empannelled and sworn as a juror on the trial of the *State vs. Edward V. Monroe,* this deponent, charged with murder, and not until he had been so taken, empannelled and sworn as a juror.

Sworn to in open Court, this 29th May. 1848.

[Signed]     EDWARD V. MONROE.

GEORGE C. TICKNOR, *Clerk.*

I have deemed it my duty to spread out fully, all the facts connected with this case. It is one that has created much excitement in the section of country where the catastrophe occurred, and which has attracted no ordinary share of attention in every por-

tion of the State. The nature of the transaction is well calculated to produce emotion. And the character, calling, and connexion of the principal parties involved, are such as utterly to preclude the idea of indifference, where so much, too, is at stake. It is excusable for friends on both sides to feel on this melancholly occasion. But calmness and composure become this tribunal; and we will proceed, with all practicable brevity, to express our opinion on the various points presented in the record and argument.

And with a view to condensation, instead of considering each alleged error separately, we will endeavor to group together such as properly fall under the same head, omitting all reference to the assignments which were abandoned in the discussion.

[1.] And the first complaint is the rejection, by the presiding Judge, of the whole of the testimony which went to establish by prisoner's own acts and declarations, his knowledge of the threats and violent conduct of the deceased, and of his constant alarm and apprehension by reason thereof, of death or some great bodily hurt at the hands of Macon.

This is a nice question, and one which requires to be treated with delicacy and discrimination. If we unconditionally refuse to allow a defendant, under any circumstances, to have his conduct interpreted by his acts and speech, we shall frequently deliver over the accused, a helpless and hopeless sufferer, to the penalty of the law. If, on the other hand, we permit him to manufacture testimony for himself, the most mischievous consequences would often ensue. For how easy is it to feign fears which are not felt, and shape our course in such a way that premeditated revenge, while it gluts itself in the blood of its hapless victim, will refer to the past, as proof, not merely of innocence, but of the harrassing alarm, from the bondage of which the accused has long groaned to be delivered. When an act is done, to which it is necessary to ascribe a motive, it is always considered that what is said at the time, from whence the motive may be collected, is a part of the *res gestæ*.

[2.] As, where the question is under the Bankrupt Act, whether a trader ordered himself to be denied when at home, or left his house in order to delay creditors, what he said at the time of the act done, must necessarily be admitted to explain it, though not what he said at another time. *Rep. Temp. Hard.* 267.    5

*T. R.* 512. So in an action by husband and wife, for wounding the wife, Lord C. J. Holt allowed what the wife said immediately upon the hurt received, and before she had time to devise any thing for her own advantage to be given, in evidence as a part of the *res gestæ. Skin.* 402. And Lawrence, J. in *Aveson vs. Ld. Kinnarid,* 6 *East,* 188, said that "it is every day's experience in actions of assault, that what a man has said of himself to his surgeon, is evidence to show what he suffered by reason of the assault." Lord Ellenborough, C. J. in the same case, stated that he should admit in evidence, in an action against the adulterer, the declaration of the wife upon her elopement, that she fled from immediate terror of personal violence from the husband; though not if it were a collateral declaration of some matter which happened at another time. And the whole Court unanimously held in the case in *East,* that in an action by the husband upon a policy of insurance on the life of his wife, declarations by the wife, made by her when lying in her bed, apparently ill, stating the bad state of her health, at the period of her going to Manchester, (whither she went a few days before, in order to be examined by a surgeon, to get a certificate of him of good health, preparatory to making the insurance,) down to that time, and her apprehension that she could not live ten days longer, by which time the policy had to be returned, are admissible in evidence to show her own opinion, who best knew the fact of the state of her health at the time of effecting the policy, which was on a day intervening between the time of her going to Manchester and the day on which said declarations were made. In *Rex vs. Elisha Smythe and three others,* which was an indictment for a forcibly entry, counsel for Ghddard, one of the defendants, wished to ask the witness, whether, at the time the house was searched, Goddard having a warrant in his hand, did not state for whom he searched. *Archbold,* for the prosecution, objected, that what Goddard said could not be evidence in his own favor. But Lord Tenterden, C. J. overruled the objection, and decided that he would hear what the defendant, Goddard, said at the time, as to who he was searching for. 5 *Carr. & Pay.* 201. In *Rex vs. Crutchley, Ib.* 133, on an indictment on the *Sta.* 7 *& 8 Geo. IV. c.* 30, *s.* 4, for breaking a threshing machine, the Court allowed William Davis, a witness, to be asked whether the mob by whom the machine was broken, did not compel persons to go with them, and

then compel each person to give one blow to the machine, and also, whether at the time the prisoner and himself were forced to join the mob, they did not agree together to run away from the mob the first opportunity. In general, what a party says, is not evidence in his favor, unless it be a part of a conversation of which some other part has already been given by the opposite party. But where the declarations of a party accompany the act and are a part of the transaction, it becomes admissible. These declarations are often extremely material in cases of mutiny on board ships, as it frequently happens that when the mutineers have deposed the captain, they find that none of them are able to navigate the ship, and they then force one of the officers to assume the command of her; and he is in many cases brought to trial because he appeared to be acting with and directing the mutineers.

In *The State of Maryland vs. Charles Ridgley*, 2 *Harr. & Mc-H.* 120, an indictment for murder, the Court determined that the declarations of the prisoner antecedent to the fact, were admissible, as tending to explain and reconcile his conduct, and to discover the *quo animo* with which the homicide was committed. I would remark, as it respects this case, which is so directly in point, that it seems from the meagre report of it accompanying, a half-page only, that for aught that appears, it was decided without argument and without authority.

Hosmer, Ch. J. in *Enos vs. Snykle*, 3 *Conn.* 250, thus laid down the rule : That to be a part of the *res gestæ*, the declarations must have been made at the time of the act done, which they are supposed to characterise, and well calculated to unfold the nature and quality of the facts they were intended to explain, and so harmonize with them as obviously to constitute one transaction. And we apprehend the rule as thus stated, approaches as near to accuracy as is consistent with the nature of the subject. The difficulty will be found in its application. We will endeavor, however, to test the evidence offered and refused by this principle.

And upon this point I am free to acknowledge that I feel some embarrassment. The first inclination of my mind was to reject the whole of the testimony of Hawkins and Smith, as to the acts and declarations of the prisoner. And I still think that the safer course will be to exclude much of this proof. The difficulty consists in sifting and separating that which is legal from that which

is illegal. The exclamation of Monroe to Hawkins, in the office of the latter on the morning of the day when the killing took place, "*yonder comes Macon with his yauger*," is free from valid objection, but what follows, "*he intends to shoot or kill me*," is clearly inadmissible. The transaction as testified to at the window of the Court-House, and the conversation between the witness and the prisoner, relative thereto, is of doubtful competency. Were I presiding in a capital case, I should dislike to reject it. Defendant's counsel proposed to ask the witness why he left the office where he and prisoner were in the morning, with a view of bringing home to the knowledge of the prisoner, the conduct of the deceased on this occasion, his violence, anger, threats, &c. which evidence was disallowed. No sufficient reason occurs to us for repelling this proof. We cannot anticipate what it would have disclosed. There is nothing exceptionable in the question propounded. For aught that appears, the answer might have brought home to the prisoner knowledge of the conduct of the deceased, and of his threats, wholly independent of his own sayings. We hold, too, that the statement of prisoner to witness before the shooting took place, that he saw the conduct of the deceased on the morning of the day, as it was described by Hawkins, should have been let in. For whether he saw it or not, and even conceding that this declaration was false, still it establishes the fact conclusively, and a most material fact it is too, that the prisoner was apprised beforehand, from hearsay or observation, of the hostile purpose of the deceased.

As to the testimony of Smith, in reference to the peace warrant—had the witness gone farther, and swore that defendant actually applied for a warrant, and that upon his advice, it was abandoned, I should be strongly disposed to hear the evidence. But it stops one step short of this. It only proposes to show that the prisoner *consulted* with witness, touching the propriety of resorting to the proceeding. We think it useless to examine into this branch of the case more minutely.

[3.] It is contended that the Court erred in refusing to allow the introduction of testimony, to prove a continued series of threats accompanied by acts of violence, from the deceased towards the prisoner—commencing some months previously, and coming down to the time of the killing, and all showing a determination on the part of the deceased to take the life of the defen-

dant before the next ensuing term of the Lee Superior Court; and which threats and conduct were known to the defendant.

My remarks will be short on this point, having already decided during the present term, in the case of *John D. Howell vs. The State,* that naked threats unaccompanied with personal violence were admissible, to show the reasonableness of the defendant's fears, provided a knowledge of the threats were brought home to him.     This doctrine may be inferred from what fell from the Court in *Hudgins vs. The State,* 2 *Kelly,* 173.

On the trial of Meade and Belt for the murder of Law, 1 *Lewis C. C.* 184, the Court allowed evidence to be given of the threats of the boatmen, the day previous, that they would come at night and pull his house down.     And Holroyd, J. in charging the jury, said:  "If you are of the opinion that the prisoners were really attacked, and that Law and his party were on the point of breaking, or likely to do so, and *to execute the threats of the day before,* they were justified perhaps in firing, as they did."

In *The People vs. Rector,* 19 *Wend.* 567, one of the questions raised by the prisoner's counsel, was, that the Court should have received proof of the violent breaking of the prisoner's house, the previous Saturday night—that the inmates had been badly abused ; and *that the rioters threatened to return another night, soon after, and break in if they were not admitted,* and this was offered to establish a reasonable ground for the prisoner's apprehending of a similar threat, now repeated and attempted.    The Court say—" They do not understand it to be objected, that real alarms on the part of the prisoner, on apparent though unreal grounds, was not *pertinent* to the issue ; and Meade's case, already referred to, is cited with approbation.

In *Patrick Blake's case,* 1 § 2  *City Hall Recorder,* 99, the Court held, that the prosecutor had the right to show repeated quarrels between the prisoner and the deceased, to establish the *malo animo ;*  but that he could not go back to a remote period, and show a particular quarrel, unless he followed it up with proof of a continued difference, flowing from such quarrel.    Such, precisely, was the object of the evidence, which was repelled.    What, I ask, really excited the prisoner to the commission of this act ?    He seems throughout to be wholly free from the dominion of passion.    Did he really and *bona fide,* then, believe that deceased was coming towards him with intent to

Monroe *vs.* The State of Georgia.

kill, or do him some great personal injury? Did not all the circumstances justify this apprehension? In the opinion of this Court, any thing which could have operated upon his mind may be proved. Monroe seems to have lived in habitual fear and alarm, and he probably had good cause.

[4.] It is further argued that the Court erred in rejecting evidence which went to show that the deceased was a violent, rash, and bloody-minded man, reckless of human life, in the habit of taking advantage of his adversaries in personal contests, and not willing to give them a fair and equal chance in fight, and that the prisoner was well acquainted with his character, in this particular. As a general rule, it is true, that the slayer can derive no advantage from the character of the deceased, for violence, provided the killing took place under circumstances that showed he did not believe himself in danger. Yet in cases of doubt, whether the homicide was perpetrated in malice, or from a principle of self-preservation, it is proper to admit any testimony calculated to illustrate to the jury, the motive by which the prisoner was actuated. 3 *S. & P.* 308. And in this view, we think the evidence was improperly ruled out. Reasonable fear, under our code, repels the conclusion of malice; and has not the character of the deceased for violence, much to do in determining the reasonableness or unreasonableness of the fear under which the defendant claims to have acted? Does it make no difference whether my adversary be a reckless and overbearing bully, having a heart lost to all social ties and order, and fatally bent on mischief; or is a man of Quaker-like mien and deportment? One who never strikes, except in self-defence, and then evincing the utmost reluctance to shed blood? We apprehend that the imminence of the danger, as well as the chances of escape, will depend greatly upon the temper and disposition of our foe. In these cases, every individual must act upon his own judgment, and in view of his solemn responsibility to the law. If the assailant intend to commit a trespass only, to kill him is *manslaughter*; but if he design to perpetrate a felony, the killing is *self-defence*, and justifiable. 1 *Hawk. P. C. ch.* 28, *sec.* 23. 1 *East, C. L.* 272. Who, knowing the character of Kyd, the pirate, or of the infamous John A. Murrell, would not instantly, upon their approach armed with deadly weapons, act upon the presumption, that robbery, or murder, or both, were contemplated? We would not

be understood as applying these terms, or using this illustration in reference to the *actual character* of the deceased; but to the hypothetical case, made by the bill of exceptions.

In the opinion of this Court, there was error also, in refusing to allow the defendant to prove that as a Justice of the Inferior Court of Lee county, and at the request, and by the appointment of his associates, he became the prosecutor of the deceased, for embezzlement, as treasurer, of the poor-school fund of said county; and that in consequence thereof, the deceased vowed that the defendant should not be at the trial of said indictment, for that he would kill him. As a general rule, it is expedient to receive all the evidence which goes to show the state of feeling of the parties towards each other, at the time of the act committed. And for the same purpose, testimony may be given of lawsuits existing between the parties. *The State vs. Zellers*, 2 *Hals.* 220. How strong does this principle apply in the present case. The question to be settled is, was this homicide the result of malignity, or human infirmity, or manly caution? To answer this enquiry satisfactorily, we must transport ourselves back to the period when this rencounter took place. We must substitute ourselves in the shoes of the defendant. By becoming the public prosecutor of the deceased, he had kindled the most deadly grudge in his bosom. He proclaimed his purpose to take his life before the prosecution is terminated. His threats and menacing conduct are continued down to the fatal moment when he fell. The prisoner is forced to abandon his practice by day, and to pursue it stealthily by night. To excuse the deadly shot, is he not entitled to have all those facts and circumstances submitted to the jury?

[5.] The testimony having been closed and the cause argued by counsel; the Court, in its charge to the jury, stated that he greatly doubted the propriety of his having admitted for their consideration, the testimony showing any of the conduct, either of the deceased, or prisoner, on the day of the killing, except that which occurred immediately at the time of the killing; but it having been received, they were bound to consider it in making up their verdict. His Honor, Judge Warren, further stated, that it was a source of much gratification, that we had a Supreme Court for the correction of errors, often committed for want of time and opportunity to investigate cases on the circuit, and that if evi-

dence offered in behalf of the defendant had been improperly rejected, and it should, in consequence thereof, become necessary, the defendant could take the case up, and have the error corrected. And to these instructions the accused by his counsel excepted.

It being the opinion of this Court, that the evidence referred to was both legal and proper, we are constrained to say that its force should not have been weakened by this intimation from the Bench. We think, too, that the remark which fell from the Court, reminding the jury of the existence of an appellate tribunal, to which the case with which they were then charged might be carried up, if the evidence offered by the prisoner had been wrongfully withheld—however well intentioned, was calculated, nevertheless, to lessen their sense of their own responsibility; and at the same time to convey the idea, that the proof already before them was not sufficient to acquit the defendant.

So much for what occurred during the progress of the trial, and before the verdict was rendered.

[6.] One of the *new* grounds taken in the motion for a new trial, was that William Stanley, one of the jury who tried the case, had prejudged the prisoner, having been heard to declare on Sunday, before the trial, as appears by the depositions of Tucker and King, that "*from what he knew, he would stretch the prisoner.*" It appears also, from the affidavit of Monroe, himself, that the fact of the disqualification of the juror was unknown to him till after he was sworn and empannelled, when it was too late to except to said juror, for want of qualification. *Prince,* 429.

We fully subscribe to the doctrine, that motions for new trial, are to be received with caution, and for the reason assigned, because there are few cases tried, especially those involving life, in which something new may not be hunted up, and because it leads very much to perjury, to admit new evidence after the party who has lost the verdict has had an opportunity of discovering his adversary's strength and his own weakness. *5 Serg. & Rawle,* 41. Still prisoner's have rights, and there are certain legal safeguards which must be ·preserved immaculate ; the purity of the stream of justice is involved in it. One of these safeguards is, that the jury shall be impartial and unbiassed ; their minds free from pre-judgment. It is desirable, if practicable, that every juror's mind should be as white as paper. This, however, is

scarcely to be expected, when they come from the same county where the offence is committed, or, in the language of the Common Law, *de vicineto*. *Prejudging* the prisoner is one thing, and the expression of loose opinions, founded usually upon rumor, when a revolting crime has been recently committed, is very different. Whenever the juror evinces a predetermination to condemn, an adjudication before trial or verdict, without regard to the evidence, it is a *mis*-trial *per se*; and the fact, when disclosed, should entitle the party to a rehearing. And while I would treat this institution, so vital to liberty and free government, with great tenderness, I must say that he who gets his consent to serve on a jury, when he must know that his mind is utterly disqualified from doing justice between the prisoner and the State, is guilty of gross misconduct. To convict one capitally under such circumstances, is to perpetrate an offence little short of murder itself.

What does the showing disclose in this case? Was the expression used by Stanley, the juror, the idle and unguarded ebullition of excited feeling? Was it of such a nature as to render it likely that his prepossession would readily yield to proof? We think not. He declared that "*from what he knew*," not what he learned by rumor or idle gossip, "*he would stretch the prisoner.*" Did not this very language indicate a state of feeling not easily to be effaced? His mind was made up.

[7.] We take the rule to be this: Whenever the objection to the juror would be good cause of challenge for favor, if discovered in time, it will be ground for a new trial, if not found out till after verdict. In this case the record shows no attempt on the part of the State to support the verdict and the competency of the juror, not even by his own affidavit. And the omission seems to be a virtual concession of his prejudice as alleged. And for aught that appears on the other hand, there is no ground for presuming negligence on the part of the defendant in not ascertaining this fact before trial.

If a party have cause of challenge, and know of it time enough before the trial, if he do not challenge, he shall not have a new trial. *Contra*, if he has not timely notice. *Graham on New Trials*, 53.

If the ground of application for a new trial, disclosed by the affidavits on the part of the defendant, had remained unanswered and

Monroe *vs.* The State of Georgia.

uncontradicted, I should have thought the Court justified in making this rule absolute ; for it would go to create a prejudice against trial by jury, if verdicts are to be the result of previous determination; and expressions such as those imputed to the juror, Hart, would have been a good ground of challenge, if proved to the extent to which they have been alleged in the affidavit.   In *Rex vs. Cook*, 6 *St. Tr.* 337, expressions of this nature were deemed so improper, that the juror ought not to be asked whether he had used them, but that they ought to be proved by such as had heard them spoken.    If, therefore, the expressions imputed to Hart had remained unanswered, the cause must have been referred to a new jury.   *Per Tindal, Ch. J. Ramadge vs. Ryan*, 9 *Bingham*, 333.

A new trial was granted upon affidavit in *Dent vs. The Hundred of Hertford*, 2 *Salkeld*, 645, because the foreman of the jury declared before the trial, that the plaintiff should never have a verdict, whatever witnesses he produced.

I would observe that the Court, in such cases, will not receive an affidavit of the fact from the jurymen themselves.   2 *Blackst.* 1299.  1 *T. R.* 11.

[8.] They will be heard, however, in their own vindication.   3 *Greenl.* 204.   4 *Vemt.* 363.

In *Cain vs. Cain, et al.* 1 *B. Monroe*, 213, it was decided, that although the affidavit of one of the jurors certifying that another one of them made declarations since their finding, which, if true, evinced his partiality and incompetence, was inadmissible for several reasons, and especially on grounds of policy, for preventing the insecurity which might result from tampering with juries after verdict ; yet it does seem to us, continued the Court, that the evidence of *Smith*, a stranger, and that of the party, *John Cain* himself, of the fact that one of the jury (Hahn) had frequently declared, before he was summoned as a juror, that he never would find a verdict in favor of a will, which did not make equal distribution among the testator's children, were admissible and furnished sufficient cause for a new trial.   *Cain's* affidavit also avowing, as it did, that this fact was unknown to himself and his counsel until after the verdict.

In *Cody vs. The State*, 3 *Haw. Miss. R.* 27, this question came under the consideration of the Court.   It appears from the report, that Patrick, one of the jurors declared, " that if he should be

on the jury, he did not think he could clear the defendant, but should be bound to find him guilty." This fact was made to appear by the affidavit of William Snow. Judge Trotter said : " A due regard to the sanctity of the trial by jury and the constitutional right which has been guarantied to every man, to a trial in all cases of the kind before the Court, by an impartial jury of his county, demanded, as he conceived, a new trial."

Whatever would be a good cause of challenge to a juror, say the Court in Kentucky, if discovered in time, will be cause for granting a new trial, if not discovered till the jury have retired to consider their verdict. *McKinley vs. Smith, Hardin,* 167.

In *State vs. Hopkins,* 1 *Bay,* 373, an affidavit was produced, that the foreman of the jury had, on the morning of, and before the trial, said that he had come from home to hang every damned counterfeiting rascal, and that he was determined to hang the prisoner at all events. This, it was contended, was such an improper piece of conduct on the part of the foreman, as was sufficient to vitiate any verdict, much more so where the life of a citizen was concerned. The Court were of the opinion that the objection was a good ground for a new trial; and that it would be difficult to say that it was not so, even if the character of the witness was of a suspicious character. At all events, it is a doubtful point, in which case it was the duty of the Court to lean on the merciful side, and give the prisoner another chance for a fair trial.

In 2 *Morgan,* 25, a new trial was granted upon affidavit that the foreman declared that the plaintiff should never have a verdict, whatever witnesses he produced.

[9] And these decisions are all right. The law requires that jurors should be *omni exceptione majores,* not liable to an objection on account of malice, ill-will, hatred, revenge, pre-judgment, or the like. If they are under any of these influences, they are certainly improper jurors to try a citizen for his life.

If a person, who was on the first trial, is put on the second trial, and the fact is not known to the party until the second verdict is rendered, it is sufficient cause for a new trial. 4 *Bibb* 45. Where a juror, previously to the trial, declared that if he was on the jury he would give $1000 damages, and the defendant did not know the fact until after the verdict, it is sufficient ground for a new trial. *Ib.* 191. Where a party after a verdict, proves that

one of the jurors had said before the trial that his mind was made up against him, and the party also makes affidavit that he knew nothing of the fact before the trial, this is cause for a new trial. 3 *Bibb.* 37.   A juror having declared before the trial, that he never would give a verdict against the party who afterwards obtained the verdict, is good ground for a new trial, if the objection was not known to the other party at the time of the trial.   2 *Chapman,* 45.

The doctrine in Virginia, upon applications of this kind, is, that the Court will weigh all the circumstances of the case, and decide, whether in justice to the State and the prisoner, a new trial ought or ought not to be granted. 1 *Robinson,* 575.   In *David E. Brown vs. the Commonwealth,* 2 *Va. Cas.* 516, a motion was made for a new trial on the ground, that one of the jurymen had made up an opinion of the guilt of the defendant, before the trial, and admitted it afterwards in a conversation with some young gentlemen who were questioning him as to the propriety of the verdict.   The motion was overruled for the reason, that the conversation was not of a very serious character, and was had in consequence of the verdict being questioned rather improperly, and was therefore, entitled to little weight.   Besides, the juryman himself, who was admitted to be intelligent and highly respectable, expressly swears, that his judgment was not influenced by the reports he had previously heard, but by the *testimony only.*   See also, 2 *Va. Cas.* 6.   5 *Rand.* 655.   And in *Jones's case,* 1 *Leigh.* 598, the Court refused to set aside a verdict of guilty *which it considered just in itself,* though the objections perhaps, might have been good ground of challenge, if known and disclosed before the jurors were elected and sworn.

If this case rested upon this footing alone, we should be strongly inclined to grant a new trial; for we cannot say that we are satisfied with the justice of the verdict.

In *Jeffries vs. Randall,* 14 *Mass.* 205, it was held, that where a party objecting had made the requisite inquiry of the juror upon the *voir dire,* and failed of discovering the fact which would have disqualified him, a new trial might be granted, if it should afterwards be discovered, that he did not stand indifferent in the cause.

The record before us does not disclose, whether any preliminary inquiry was made of the juror at the time of the trial, accor-

ding to the directions of the Statute,. with a view to test his indif-ference.

*Dicta*, may be found, I know, which upon slight examination, might seem to conflict with the rule which we maintain.    In *Booby vs. the State*, 4 *Yerg.* 111, it is said, that a new trial will not be granted, because of the incompetency of a juror; and Judge WHITE, in delivering the opinion of the Court, remarked, that to render this ground available, for the purpose of setting the verdict aside and granting a new trial, it ought to appear, that the party injured by it, the defendant, could not avail himself of it for challenge.    The law will not permit him to lie by, take the chances of a verdict in his favour, and if adverse, bring forward his exception waived at the proper time of making it, and claim a further benefit.    It will be plainly seen however, from reading the whole of this case, that the main if not the only difficulty with the Court, was owing to the defect in the evidence by which the application was supported.    The juror himself, swore that he believed the defendant did not know that he had bet on the verdict before the trial.    But the Court said, they could not rely on this; for if true, there was better evidence in the power of the defendant to show it, that is, himself. . And, since he was silent on the occasion, the testimony of Larkman, the juror, was inferior evidence and ought not to be received.

The inference therefore, manifestly is, that if the party was ignorant of the objection at the time of the trial, and that fact had been satisfactorily established, a new trial would have been awarded, notwithstanding the general observations which fell from the Court.

But for the apprehension of extending this opinion to an unreasonable length, I would notice the few other cases to be found in the books, seemingly adverse to the doctrine which we propose to establish.    They will be found to turn on other points, and when rightly understood, to strengthen our position.

[10.] The other ground for granting a new trial in this case, is, the misconduct of the jury, after they had retired to their room. It appears from the affidavits of the bailiffs, Heard and Levining, that after the jury were charged with the case and put in custody of the officers of the Court, a portion of them withdrew from the room, and were absent in the dark and out of sight of the bailiffs for some fifteen or twenty minutes at a time, and under

circumstances which shewed, that they might have been, if they were not, actually tampered with.

Whether the mere separation of the jury in a criminal case, is of itself sufficient to set aside a verdict, is an open question, and one by no means authoritatively settled.    In civil suits and small misdemeanors, the prevalent authority in England is, that the separation of the jury, is not sufficient to set aside the verdict. The *King vs. Wool and others*, 1 *Chitty*, 401.   In cases of felony, however, many of the Courts, especially in this country, seem inclined to adopt a stricter rule.    It is frequently stated in the authorities, that in modern times, the antiquated strictness of the law has been much relaxed in this regard, and that in no case is it necessarily wrong, for a jury to disperse with or without the permission of the Court, during the progress of the trial.    11 *Ohio Repts.* 474.   13 *Ib.* 492.   15 *Ib.* 72.   4 *Cowen*, 26.   1 *Pennsylvania Repts.* 278.   1 *Halst.* 110.   1 *Gallison C. C. R.* 360. 2 *South Ca. Repts.* 827.    1 *Conn.* 232, 238.    *In note* 3 *Cowen*, 355.   8 *Pick.* 170.    4 *Johns.* 487.   1 *Ch. Cr. L.* 629.   2 *B. and A.* 426.   2 *Wend.* 352.   3 *Johns.* 252.

And yet in the oldest case reported, to wit : the *Earl of Kent's case*, in the year book, in the reign of Henry VII, it was decided that the dispersion of a jury by reason of a thunder storm, and a conversation held with some of them, in which it was suggested that the matter in controversy was better for the Earl of Kent than the Bishop, upon great consideration, the verdict was sustained and pronounced good, notwithstanding the irregularity.

In a note to Smith & Thompson, 1 *Cowen*, 221, by the learned Reporter, all the cases, English and American, are collated, and the conclusion of this review is, that the propriety or impropriety of keeping the jury together in each particular case, is a matter resting pretty much in the sound discretion of the Court.

Thus circumstanced, we are called on to fix the rule, for the first time in this State ; and of one thing we are clear, viz : that no principle or practice tending to insure the impartial administration of justice and the purity of jurors, should in the slightest degree, be abandoned or impaired.

We will state a few cases, and then deduce the principle, which after mature reflection we consider the true one.

George McLain, was convicted in 1836, in Tennessee, of the crime of murder in the first degree.   During the progress of the

trial, several bills of exceptions were filed for irregularity in conducting the same, and after the verdict had been returned, a motion was made for a new trial, founded on the affidavits of John Clayton, one of the jurors, and Martin B. Brim.    The affidavits of Clayton and Brim, show, that after the jury were sworn, and during the continuance of the trial, which lasted several days, a part of the jury did frequently of a night, after they had retired from the Court, absent themselves from the balance of the jury, without being under the charge of an officer, and remain absent for the space of fifteen or twenty minutes.

From this brief statement it will be perceived, how identical are the facts in the two cases.

The principal question, says Judge TURLEY, in this case is, whether the Court below erred, in refusing to grant a new trial for the causes set forth in these affidavits.    *We think it did.* The right of trial by jury, has always in England, and in this country, been considered of such vital importance to the security of the life, liberty and property of the citizen, that great care has been taken to preserve it unimpaired.    That the person accused may have the full benefit of a judgment by his peers, it is absolutely necessary that the minds of the jurors should not have prejudged his case ; that no impression should be made to operate on them, except what is derived from the testimony given in Court, and that they should continue impartial and unbiassed. These objects can only be attained, by selecting those who have no preconceived opinions as to the guilt or innocence of the prisoner, and by not permitting them to separate from each other after they have been sworn, and mingle with the balance of the community.    This was directed to be done in the case now under consideration, but was not complied with.    The affidavits, *which are uncontradicted,* show conclusively, that several of the jury repeatedly separated from the others, without the care of the officer appointed by the Court to attend them, and were absent for the space of fifteen or twenty minutes ; long enough to have been tampered with, if there had been any disposition to do so. It is not necessary for the prisoner to prove that they were, during their absence, subjected to improper influence from others; it is sufficient, if they might have been.    There would be no safety in a different rule of practice ; for it would be almost im-

possible ever to bring direct proof of the fact, that it was done. 10 *Yerg.* 241.

The *Commonwealth vs. John McCaul, Va. Cas.* 271, has always been cited as a controlling precedent upon this question. It was a trial for grand larceny. The trial continued 4 days, on each of which, the Court adjourned for about 2 hours, giving orders that in the meantime, the jury should be kept together in a room by themselves, where they were allowed refreshments. On their way to the jury room at the 2d adjournment, one of the jurors having been unexpectedly sworn on the jury, separated from his fellows for about 20 minutes, to attend to some necessary business. He was unattended by an officer. Several persons asked him during dinner at his boarding house, if the trial of McCaul had ended. To which he answered in the negative ; but had as he stated, no further conversation with any one on the subject of the trial ; denied that he had been practised with, and no abuse appeared. Another juryman was absent for a few minutes on a visit to a sick child with an officer from whom he was separated about five minutes, on going into the chamber to see the child.

There being a verdict of guilty, *Mr. Wirt* moved to set it aside, on account of the misconduct of the jury. A majority of the Court were of the opinion, that actual tampering or conversation on the subject of the trial with a juryman, was not necessary to set aside the verdict ; and Judge NELSON, who delivered the opinion of the Court, said, "from the mode in which collusion and tampering are generally carried on, such circumstances are generally known to no person, except the one tampering and the person tampered with, or the persons between whom a conversation may be held which might influence the verdict. If you question either of these persons upon the subject, he must criminate or declare himself innocent ; and you lay before him an inducement not to give correct testimony. The rule should never be relaxed, which requires the jury *to be kept together*, except in cases of imperious or perhaps of absolute necessity. By allowing that a jury may separate without such necessity, and that their verdict shall stand, unless the party accused, who in these cases is in the custody of the law, can show, not only that the jury have separated, but that they or a member of it has also been tampered with, or held communication on the subject, this great barrier against oppression may gradually be sapped and undermined,

and the bulwark cannot long remain.      Such a precedent would be productive of evils incalculable, and too great for the Court by its decision to allow a door to be opened, for every danger, and particularly in such a case as this, should be watched and opposed in the beginning.    The Court will preserve with " fear and jealousy," and will not expose the trial by jury in criminal cases, from such risk of contamination as arises from the affidavits in this case.    Although there might be, and probably was, no tampering with any juryman in this case,  yet in a free country, in deciding a particular cause, the decision is to be according to general principles as applied to that case ; and more good will arise from preserving the sacred principle involved in this case, than evil from granting a new trial, although in this individual instance, a verdict has probably been given by twelve men, in fact, unbiass ed by the separation."

It is a source of sincere and honest congratulation, to find on all suitable occasions, the friends, founders and fathers of our civil and judicial system,  standing up so staunchly and watching with such lynx-eyed  " fear and jealousy," an institution on the preservation and purity of which, so much depends.    And we flatter ourselves, that since the organization of this Court, short as its existence has been, something has been done to establish *trial* by *jury* in *criminal prosecutions* in this State, on a foundation so broad and deep, that it will not easily be shaken.    On this vital subject, there should be no vacillation in the judicial mind.

In the case of the *State vs. Prescott*, 7 *New Hamp.* 287, there were many acts of separation by the jury, most of which in the opinion of the Court, were satisfactorily explained.    It was in proof however, that the members of the jury with one exception, resorted to a barber's shop kept in the same building where they boarded, and some of them more than once.    They were unaccompanied by any officer, and there was other company in the room at the time they came in, and remained while they were there, which was from ten to fifteen minutes.    The owner of the shop further testified, that at one time two of the jurymen were coming through the door of his shop, when an individual remarked, that the jury would bring in Prescott guilty ; that the jurymen were not more than ten feet from him at the time, and approaching towards him, and that some reply was made to it.    One

of the two jurymen, denied any conversation with any one relative to the prisoner, or his trial, or that he heard any.    The other stated, that he heard no conversation *that he could recollect*, relative to Prescott, or his trial, in passing to or from said shop, or while in the same.    *A new trial was granted.*    The Court say, certainly under all these circumstances, we cannot say affirmatively, that we are assured beyond reasonable doubt, that the prisoner has had such a trial as the law secures to him, before we can rightfully pass upon him a sentence of death.

Suppose we could say that the jurors might have heard nothing; that they probably did hear nothing—that is not sufficient; we cannot say that there is no suspicion of abuse.    We cannot say that there is no reasonable doubt that none of them heard remarks which would be very likely to be made, when, under such circumstances, three of the jury give a qualified denial.    These irregularities may not have affected the prisoner, but that is not enough.    Even if it was probable they had not, mere probability would not suffice.    We do not intend to impute intentional misconduct to any of the jury, during any part of the trial.    We doubt not, they meant to try the case faithfully and impartially.    If, from the infrequency of trials of this nature, the people generally are not fully aware of the strictness with which the law guards the rights of the accused, such infrequency so creditable to the community, may well furnish matter of extenuation, for the departure from the ordinary rules during this trial; but it can furnish no reason why the prisoner should not have extended to him that measure of mercy and justice, which the law has wisely provided in cases where the consequences may be so awful, and where the sentence once executed, there can be no opportunity for revision or the correction of error.

The doctrine in new York is, that the mere separation of the jury, though empannelled to try a capital offence, and although they separate contrary to the directions of the Court, will not, of itself, be a sufficient cause for setting aside the verdict.    But if there be the least suspicion of abuse, the verdict will be set aside. 2 *Cowen.* 589.    4 *Cowen.* 26.    5 *Cowen.* 284.    7 *Wend.* 423.    In this last case, Mr. Justice Sutherland, who delivered the opinion of the Court, said : " The conclusion, from all the cases decided in this State is, that any mere informality or mistake of an officer, in drawing a jury, or any irregularity or misconduct in the jury

themselves, will not be a sufficient ground for setting aside the verdict either in a criminal or civil case, *where the Court are satisfied that the party complaining has not, and could not have sustained any injury.*"

Mr. Justice Parker, in commenting on the positions thus laid down, thinks, *and so we think*, there is another principle which should also be applied in a criminal case, which is, that where there has been an improper separation of the jury during the trial, if the verdict is against the prisoner, he is entitled to the benefit of a presumption that the irregularity has been prejudicial to him; and that it is incumbent upon the government to show, and that beyond a reasonable doubt, that the prisoner has suffered no injury by the departure from the forms ordinarily pursued in the administration of justice. The prisoner is entitled to a compliance with the forms provided by the law, to secure him a fair and impartial trial; and if these grounds are neglected or disregarded, he is at least entitled to require at the hands of the government, satisfactory evidence that he has not received detriment by reason of such neglect, and is not to be put to show affirmatively, that such departure from the customary mode of trial has been the probable cause of conviction.

Let us now apply these principles to the present case.

Heald, one of the bailiffs, after reminding the jury that they had been forbidden, strictly, by the Judge, to speak to any body—left them in charge of the other bailiff, while he went for candles. On his return, he looked out of the window of the room where they were assembled, and saw two of the jury out at the end of the house, conversing so low that he could not tell what they were talking about. One of them was captain Blake. He requested him to come in—he replied that he would presently, or something to that effect, and in a few minutes they both came in. The deponent walked backwards and forwards before the front door of the room, there being two open doors to it, one in front, on the street, and the other in the rear, opening on a corn-field; some of the jury called for water; deponent went into the room and handed out the bucket to the other bailiff in attendance, who remarked that there must be somebody talking behind the house. Deponent went to the back room, and saw two of the jury coming; Blake was one of these jurors; and when he came in, another juror remarked that he wanted to go out and consult with

him, too. They retired through the back door, out of the view of the office. Deponent then went out himself, and watched from behind a china tree, but saw nobody during the minute or two that he remained. He then walked round the house and went back to the gate opposite the front door, and sent Levining, the other bailiff, to order somebody off, once or twice. Levining states that the building in which the jury deliberated, was a private house, having two rooms, and no upper story—one front, and one back door. That during the consultation, and before the verdict was made up, the jurors, one, two, and as many as three at a time, left the room through the back door of the building, there being no shutter to the front door; and the deponent thinks to neither; that they were in the dark, and unattended by any sheriff, deputy sheriff, or bailiff, and that they were absent for some fifteen, twenty, and thirty minutes at a time. That at the commencement of their deliberations, some of the jury declared they never would find the defendant guilty, others said equally positive, they never would acquit. On one occasion during said deliberations, one of the jurors who had expressed himself decidedly in favor of the innocence of the accused, and one who had expressed himself as strongly the other way, left the jury-room and went out, where witness saw them conversing secretly, but did not hear or understand any thing they said; they were thus holding their private consultation in the dark, which lasted some twenty or thirty minutes, another juror joined them, when one of them, and he thinks Mr. Blalock, who was in favor of convicting the prisoner, told the other juror to go back, which he did; at the expiration of the time above stated, they returned and the juror who went out favorable to the defendant, agreed to sign the verdict of guilty. A part of the time they were out of sight of deponent; *there were a number of persons about and around the jury-room, who were not jurors, and whom this deponent was exerting himself to keep away. Two of said jurors, so lurking about said jury-room, to wit: Alfred Kersey and William Korkadale, cursing this deponent, and swearing they were in the public street, &c. &c.* He further states, that during their deliberations, all the jury were hardly ever in the room at the same time. There was less calm deliberation, and more confusion and excitement than he ever saw before in a jury-room, and especially among many or several of the jurors, some of them deporting

themselves in such a manner, as to elicit the remark from one of the bailiffs, that they resembled bees starting to swarm.

I will not comment on those affidavits which are wholly un-contradicted. The bailiffs to whose custody this jury was committed, appear to have used all diligence *to keep* them, as was their duty. The probability is, that they have been unable to protect the prisoner from the hostility of his enemies. That malign influences were brought to bear upon the jury, there can be no doubt. It is not certain that any one spoke *to them* during their delibera-tions, upon matters pertaining to the trial. It is difficult to resist the conviction, however, that persons "*lurking*" about the place, spoke *in their hearing* upon the subject. And this is equally as bad. But even if this were not so, if we were satisfied that no improper bias had been received from any extrinsic source, still there is another feature in this statement which claims the grav-est consideration. Law, reason, and public justice require that the jury should confer *together*, touching the guilt or innocence of the prisoner. And it would be establishing a most dangerous precedent to allow these secret consultations, by two or more ju-rors at a time, in separate groups and out of the presence and hearing of their fellows, to take place. Who can tell what influ-ences of argument, persuasion, or *otherwise* might not be brought to operate, under these circumstances. One overpowering mind, in this way, would soon master and subdue the timid and doubt-ful, who, although individually weak and wavering, might mus-ter courage to resist when united and associated with their fel-lows. False motives and reasons might be thus urged, which, if submitted to the whole pannel, would be readily answered, and their influence averted. I have good ground for believing that unanimity was obtained in the rendition of a verdict, in one of the most exciting case, that was ever tried in this State, by a ju-ror being threatened, apart from the body, with penitentiary punishment for an act, which, if an offence at all, could only have been resisted with a much slighter penalty. We should feel strongly inclined, therefore, to set aside the verdict for this rea-son, if *it stood alone.* Where life and liberty are involved, the ju-ry should be kept *together* from the commencement of the trial until its final termination.

It being made fully to appear then, that there has been an ir-regularity in the trial of this case by the unauthorised separation

of the jury, and the State having made no attempt to show that this could not have been prejudicial to the prisoner; on the contrary, it being rendered extremely probable that he has sustained injury from the misbehavior of the jury, the verdict must be set aside, and a new trial awarded. In the language of an .eminent and virtuous judge, on a similar occasion, God forbid that the prisoner should be sent to pray of the mercy of the Executive, a reprieve for an offence of which he has not been legally con‐victed.

Judgment reversed.